# EXHIBIT H

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
FILE NO.:  1:15-cv-222

_____

MICHAEL A. HAGER, and
CYNTHIA G. HAGER,

        Plaintiffs,

vs.

SETERUS, INC.,

        Defendants.

_____

_____

VIDEOTAPED DEPOSITION

OF

SETERUS, INC.

Taken by Corporate Representative
Achsah Jacob

_____

MAGINNIS LAW
4801 GLENWOOD AVENUE, SUITE 310
RALEIGH, NORTH CAROLINA

TUESDAY, JULY 19, 2016
10:00 A.M.
PAGES 1 THROUGH 193

2

```
 1                    ATTORNEYS OF RECORD PRESENT

 2

 3       On behalf of Plaintiffs:

 4           EDWARD H. MAGINNIS, ESQ.
             KARL S. GWALTNEY, ESQ.
 5           ASA C. EDWARDS, ESQ.
             Maginnis Law
 6           4801 Glenwood Avenue, Suite 310
             Raleigh, NC 27612
 7           emaginnis@maginnislaw.com
             kgwaltney@maginnislaw.com
 8           aedwards@maginnis.law.com

 9
         On behalf of Defendants:
10
             J. DOUGLAS MINOR, JR., ESQ.
11           Bradley Arant Boult Cummings
             188 East Capitol Street, Suite 400
12           Jackson, MS 39201
             dminor@babc.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                        I N D E X

 2      Reporter's Note: This transcript may contain
        quoted material.  If so, such material is reproduced
 3      as read or spoken.

 4

 5                   INDEX OF EXAMINATIONS

 6                                                  PAGE

 7      By Mr. Maginnis  . . . . . . . . . . .       5

 8

 9

10                    INDEX OF EXHIBITS

11      NUMBER           DESCRIPTION              PAGE

12      1    Notice of Deposition                  7

13      2    Disclosure of Corporate Affiliations and    13
             Other Entities with a Direct Financial
14           Interest in Litigation

15      3    Note                                  86

16      4    Deed of Trust                         86

17      5    Loan Activity                         89

18      6    Abbreviations                         93

19      7    Late Payment Letter to the Hagers from    95
             Seterus, 12/17/13
20
        8    Seterus Account Statement, 10/16/12    107
21
        9    Notice of Noncredit Letter to the     110
22           Hagers from Seterus, 2/17/15

23      10   Letter Regarding a Partial Payment to    111
             the Hagers from Seterus, 3/24/13
24
        11   NC Final Demand Letter to Mrs. Hager from    113
25           Seterus, 10/17/12
```

4

1                    INDEX OF EXHIBITS (Continued)

2       NUMBER              DESCRIPTION                    PAGE

3
        12   Fees and Cost Notice Letter to the           117
4            Hagers from Seterus, 4/21/13

5       13   Fees and Cost Notice Letter to the           118
             Hagers from Seterus, 9/15/13
6
        14   Default Notice Letter to the Hagers          121
7            from Seterus, 11/26/12

8       15   Seterus Account Statement, 11/16/12          143

9       16   Customer Service Record of Call, 12/6/12     145

10      17   Letter to the Hagers from Seterus' Consumer  147
             and Government Affairs Team, 4/29/13
11
        18   Safeguard Properties Invoice Dated, 7/31/13  151
12
        19   Seterus Account Statement, 8/16/13           159
13
        20   Seterus Account Statement, 11/18/13          161
14
        21   Safeguard Invoice Dated, 2/21/14            167
15

16

17

18

19

20

21

22

23

24

25

```
 1              WHEREUPON, the deposition of Seterus, taken

 2      by the corporate representative Achsah Jacob, having

 3      been called as a witness and duly sworn under oath,

 4      was taken pursuant to Notice and pursuant to the

 5      Federal Rules of Procedure on behalf of the

 6      Plaintiff, testified as follows:

 7                   MR. EDWARDS:  It's 10 o'clock and we

 8      are on the record.

 9                   DIRECT EXAMINATION

10      BY MR. MAGINNIS:

11          Q.   Good morning.  Could you please state your

12      name.

13          A.   Achsah Jacob.

14          Q.   And, Ms. Jacob, we got a chance to meet last

15      week and then briefly before the deposition this

16      morning.  My name is Ed Maginnis and I represent the

17      Hagers in this lawsuit that's been filed against

18      Seterus.

19              Have you ever given a deposition before?

20          A.   I have.

21          Q.   You have.  About how many times?

22          A.   I would say about -- I won't know an exact

23      number, but more than five.

24          Q.   More than five, less than ten or --

25          A.   Yeah.  Less than ten.
```

6

```
 1          Q.   Okay.  In the capacity of on behalf of
 2     Seterus?
 3          A.   Yes.  On behalf of Seterus.
 4          Q.   In each of those cases?
 5          A.   That is correct.
 6          Q.   Okay.  So I will keep the ground rules to a
 7     very brief minimum then since this is not your first
 8     time.
 9               There's a court reporter here.  She's taking
10     down everything that you say and I say, and so it's
11     important that we do our best to not talk over each
12     other; is that fair?
13          A.   That's fair.
14          Q.   Even though we have the camera here, there
15     is a transcript being generated, so nonverbal
16     responses, even though that's what you would
17     typically do in a conversation, don't look great on
18     the transcript.
19          A.   Correct.
20          Q.   If you could do your best to give verbal
21     responses, I know Ms. Donna would appreciate it; is
22     that fair?
23          A.   That's fair.
24          Q.   And if you do not understand a question,
25     please ask me to rephrase it.  I am happy to do so.
```

7

```
 1    But if you do respond, I'm going to assume that you

 2    understood the question.

 3        A.   Okay.

 4        Q.   Okay.  I'm going to show you a document.

 5    Let's go ahead and mark it.  We'll mark this as

 6    Exhibit 1.

 7            (PLAINTIFFS' EXHIBIT NUMBER 1 WAS MARKED.)

 8                MR. MINOR:   Thank you.

 9        Q.   And, Ms. Jacob, have you seen Exhibit 1

10    before?

11        A.   I have.

12        Q.   What's Exhibit 1?

13        A.   It is a Notice of Deposition to Seterus.

14        Q.   And did you get a chance to review this in

15    preparation for your deposition this morning?

16        A.   I did.

17        Q.   What did you do to prepare for this

18    deposition?

19        A.   I reviewed the business records that are

20    associated with the loan.  I reviewed each subject

21    matter line and the matters of which examinations

22    are requested.  And then I -- I did speak with my

23    attorney.

24        Q.   Okay.  And I obviously don't want to -- you

25    know the drill.  I don't want to ask you about
```

8

1    anything relating to those conversations.

2         When you say business records, do you just

3    mean the loan file or something else?

4    A.   The loan file.

5    Q.   Okay.  Is that a fair characterization if I

6    call it "the loan file" --

7    A.   Yes.

8    Q.   -- you'll know what I mean?

9    A.   Yes.

10   Q.   Okay.  Any other documents that you reviewed

11   other than the Notice and the loan file?

12   A.   No.  Those were -- that's it.

13   Q.   Okay.  Are you prepared to give complete,

14   knowledgeable, and binding answers on behalf of

15   Seterus with regard to these topics?

16   A.   To the best of my ability, yes.

17   Q.   Okay.  You feel like you've been prepared by

18   Seterus to give those answers?

19   A.   I am prepared.

20   Q.   Okay.  What do you do for Seterus?

21   A.   I am a legal mediation officer.

22   Q.   Okay.  What is that?

23   A.   I review our business records in preparation

24   for mediation hearings, for depositions, and for

25   trials.

1      Q.   Okay.  So what -- what you do is -- is

2    you're in-house with Seterus when things are in

3    litigation or prelitigation?

4      A.   That's correct.

5      Q.   Regarding Seterus' position in the matter?

6      A.   Correct.

7      Q.   And then you advise the in-house lawyers and

8    the outside lawyers?

9      A.   I review the business records on file and

10   represent the case as it sits.

11     Q.   Okay.  And then one of the things they do is

12   give depositions just like this?

13     A.   Yes.

14     Q.   Okay.  Well, I doubt I'll be asking you

15   anything that you haven't heard before.

16          How long have you been doing that, legal

17   mediation officer?

18     A.   I have been in the legal mediation

19   department for about three years.

20     Q.   Okay.  Doing the same things that you're

21   doing today?

22     A.   That's correct.

23     Q.   Okay.  Were you at Seterus before that?

24     A.   I was.

25     Q.   When -- Seterus used to be -- have a

10

1       different name, correct?  Was it IBM Lender

2       Portfolio Services; is that correct?

3           A.   I wasn't employed with Seterus at that time.

4           Q.   Oh, okay.  So it's always been Seterus since

5       you were working there?

6           A.   That's correct.

7           Q.   Okay.  And you -- have you been a legal

8       mediation officer the entire time you've been with

9       Seterus?

10          A.   I have not.

11          Q.   Okay.  What did you do before that?

12          A.   I was a loan underwriter.

13          Q.   What did you do as a loan underwriter?

14          A.   I reviewed a customer's financials.  And

15      customers who were applying for loan modifications,

16      I would review their financials to see, in

17      association with their loan and total loan amount,

18      if they would qualify for a loan modification.

19          Q.   Right.  Loan mods, because you guys don't

20      originate any loans?

21          A.   We do not.

22          Q.   Okay.  So refis and modifications of -- of

23      loans, you would underwrite request for refinancing?

24          A.   Only for loan modifications.  We don't do

25      refinance.

1       Q.   Okay.  So like a HAMP type thing?

2       A.   HAMP is one of the options, correct.

3       Q.   Okay.  Is that -- did you have any other

4    positions you've done at Seterus?

5       A.   No.  I was a processor before.  It's just a

6    precursor to an underwriter.

7       Q.   Okay.

8       A.   In terms of understanding the documents,

9    collecting them, et cetera.

10       Q.   Okay.  Kind of a subordinate to a loan

11    underwriter?

12       A.   Sure.

13       Q.   And you did a good job and so then you got

14    promoted to loan underwriter pursuant --

15       A.   I think I was qualified, yeah.

16       Q.   Sure.  Yeah.  And then -- and a legal

17    mediation officer is just another -- another

18    department completely?

19       A.   That's correct.

20       Q.   Okay.  Were you anything before you were a

21    processor?

22       A.   No.

23       Q.   Is there anything about working in the

24    department that includes processors and loan

25    underwriters that would inform your knowledge about

12

1     these topics?

2         A.   I'm not sure I understand what you mean.

3         Q.   Well, I don't know.  I know that there was

4     some -- in the loan file, there's some references to

5     a potential modification, but I'm not sure that

6     that's in the subject matter of the lawsuit.

7              Is there anything in your job as a loan

8     underwriter that would be relevant to some of the

9     things we're going to talk about today, if you know?

10        A.   I am prepared to take the deposition.  I --

11    like I said, I have done depositions before.  And as

12    a mediation officer, I've dealt with different

13    subject matters that Seterus has dealt with.

14        Q.   Okay.  So Seterus is a corporation?

15        A.   Seterus is a mortgage servicer.

16        Q.   Well, the lawsuit -- I know the case caption

17    is Michael and Cindy Hager versus Seterus, Inc.; is

18    that correct?

19        A.   That's how I read it, yes.

20        Q.   Okay.  So Seterus is incorporated?

21        A.   I'm not sure I have the ability to --

22    ability to answer that question.

23        Q.   Okay.  So you don't know what Seterus'

24    corporate organizational structure/corporate status

25    is in terms of whether it's a corporation

13

1     incorporated in some state?

2        A.   Seterus -- I know that Seterus is a mortgage

3     servicer.  Seterus mortgage services for Federal

4     National Mortgage loans.

5        Q.   Okay.  Well, we'll get back to that.  Let me

6     ask it a different way.  My understanding is that

7     Seterus is owned by IBM.

8        A.   Seterus is a subsidiary, to the best of my

9     knowledge.

10       Q.   Of IBM?

11       A.   Of Kyanite Services.

12       Q.   Okay.  Well, Seterus is a -- I'll represent

13    to you that my understanding is that Seterus is a

14    corporation.  And they issue stock.  Is that your

15    understanding?

16       A.   That is not -- I can't speak to that.  I

17    don't know.

18       Q.   Okay.  I'm just -- let's mark this as

19    Exhibit 2.

20          (PLAINTIFFS' EXHIBIT NUMBER 2 WAS MARKED.)

21       Q.   Have you seen Exhibit 2 before?

22       A.   There are a lot of documents that I

23    reviewed.  I don't specifically remember.

24       Q.   Don't specifically recall this one?

25       A.   Yeah.

14

1        Q.   Well, I'll represent to you that these are

2    what are called a Disclosure of Corporate

3    Affiliations and Other Entities With a Direct

4    Financial Interest in Litigation.  And a form like

5    this is typically filed in any case that's filed in

6    federal court by all the parties just so everybody

7    knows who's -- who's behind the curtain in terms of

8    company ownership.

9           And if you turn to page 2, and this is just

10   why I had asked this.  If you look at paragraph 3 --

11   do you see where I am?

12       A.   Yes.

13       Q.   And it says:

14           "Is 10 percent or more of the stock of a

15   party owned by a publicly held corporation or other

16   publicly held entity?"

17           And Ms. Gardner, your counsel, says:

18           "If yes, identify all such owners."  And

19   it's noted that International Business Machines

20   Corporation owns Seterus' stock.  Do you see that?

21       A.   I see that.

22       Q.   And -- and that's IBM the computer company,

23   International Business Machines Corporation?

24       A.   That's International Business Machines

25   Corporation.

1      Q.   That make the Think Pads and Watson and --

2   that IBM?

3      A.   Okay.

4      Q.   Is that your understanding?

5      A.   As it sits -- as it's read is my

6   understanding.  Again, like I said, I -- I can't

7   really speak to more --

8      Q.   Okay.

9      A.   -- to more than that.

10      Q.   Okay.  Well, let's look back at Exhibit 1.

11   And if you could, turn to page 5.  And paragraph --

12   there's a list of instructions.  And then do you see

13   the section that says "Matters on which examination

14   is requested"?

15      A.   I do.

16      Q.   In paragraph 1, the first one?

17      A.   Yes.  Uh-huh.

18      Q.   And it reads:

19           "Basic information pertaining to Seterus'

20   corporate history, including its organizational

21   structure, owners, whether it has ever been

22   purchased, its assets and liabilities, whether its

23   assets have been purchased, whether its liabilities

24   have been assumed, and any holding companies

25   associated with Seterus."

16

```
 1            Do you see that?

 2      A.   I do.

 3      Q.   Are you prepared to testify about topic

 4   number 1?

 5      A.   I am.

 6      Q.   Okay.  But you don't know whether IBM owned

 7   Seterus' stock?

 8            MR. MINOR:  I'm just going to object on

 9   the basis that the corporate disclosure contains the

10   information.  But obviously, you can continue with

11   your examination.

12      Q.   You can answer.

13      A.   I'm answering to the best of my knowledge.

14   And to the best of my knowledge, I answered and I

15   provided those answers to you.

16      Q.   Okay.  Do you have any reason to dispute

17   whether International Business Machines Corporation

18   owns Seterus' stock?

19      A.   No.

20      Q.   Okay.  You -- you said earlier that Seterus

21   is a mortgage servicer?

22      A.   Yes.

23      Q.   Okay.  And you said for Federal National

24   Mortgage --

25      A.   That's correct.
```

```
 1        Q.   -- loans?

 2             And is that Fannie Mae?

 3        A.   It is.

 4        Q.   Okay.  So Seterus -- sometimes I hear

 5   references to it being a Fannie shop or a Freddie

 6   shop.  Have you ever heard that before, that

 7   phrasing?

 8        A.   Yes, I have.

 9        Q.   Okay.  So you guys are what's called a

10   Fannie shop?

11        A.   We mortgage -- we service loans for

12   Federal -- for Fannie Mae, yeah.

13        Q.   Only for Fannie Mae?

14        A.   That's correct.

15        Q.   Okay.  And -- and so you're aware of the

16   Fannie Mae servicing guidelines that -- that

17   instruct their servicers on how to service Fannie

18   Mae loans?

19        A.   Yes.

20        Q.   Okay.  And you guys make every effort to be

21   in compliance with those?

22        A.   That's correct.

23        Q.   You don't originate loans?

24        A.   We do not.

25        Q.   Okay.  You don't acquire loans, right?
```

```
 1          A.   What do you mean by that?

 2          Q.   Well, you don't -- you don't acquire

 3     ownership of any loans; you acquire servicing rights

 4     to loans?

 5          A.   That's correct.

 6          Q.   All of your loans are owned by Fannie Mae or

 7     some other entity?

 8          A.   By Fannie Mae.

 9          Q.   All Fannie Mae?

10          A.   That's correct.

11          Q.   Okay.  Now, this loan was owned by Bank of

12     America at the time that it was acquired, but then

13     was subsequently transferred to Fannie Mae --

14               MR. MINOR:  Object to the form.

15          Q.   -- is that your understanding?

16          A.   My understanding is that Bank of America was

17     a prior servicer to this loan before Seterus

18     received the servicing rights.

19          Q.   Okay.  So it's -- it's your understanding

20     that Fannie Mae owned it the entire while Bank of

21     America was servicing it as well?

22          A.   I'm not going to make that representation.

23     I haven't looked at the assignments --

24          Q.   Okay.

25          A.   -- associated.
```

19

1        Q.   Okay.  You do not -- so you do not acquire

2    mortgages, correct?

3        A.   We -- we service loans.

4        Q.   Right.

5        A.   Right.

6        Q.   And I'm not trying to be repetitive or

7    tricky.  I -- you're not -- you don't make loans on

8    mortgages?

9        A.   We -- we don't.

10        Q.   Okay.  You don't originate mortgages?

11        A.   We do not.

12        Q.   You're not a mortgage banking company?

13        A.   We are not.

14        Q.   You're not a bank?

15        A.   We are not a bank.

16        Q.   IBM is not a bank?

17        A.   That I know of, no.

18        Q.   Kyanite -- you talked about Kyanite?

19        A.   Correct.

20        Q.   They're not a bank?

21        A.   Not -- no.

22        Q.   Okay.  You guys -- you guys are licensed in

23    the state of North Carolina to be a mortgage

24    servicer?

25        A.   That's correct.

1          Q.   You're not licensed to be a mortgage lender?

2          A.   Correct.

3          Q.   Or a bank?

4          A.   Correct.

5          Q.   Okay.  Let's talk about -- my understanding,

6     and -- and correct me if I'm wrong, is that

7     typically the portfolios of servicing rights that

8     Seterus acquires are on loans that are in default;

9     is that correct?

10              MR. MINOR:  Object to the form.

11         A.   Would you rephrase it, please?

12         Q.   Sure.  My understanding is that the --

13    Seterus does not -- strike that.

14              Seterus does not acquire loans one at a

15    time, is that fair, servicing rights to loans?

16              MR. MINOR:  Object to the form just

17    because of the phrase "acquire."  You had a back and

18    forth with her about "acquire" and she said they

19    don't acquire them.

20         Q.   Yeah.  And let me -- is it fair -- if I --

21    if I allude at any point that Seterus owns loans, it

22    is not my intent and I am not trying to get you to

23    say that.  My understanding is all you guys do is

24    service loans.

25         A.   Correct.

 1      Q.   And so if I say "acquire," I mean acquire

 2   servicing rights; is that fair?

 3      A.   Okay.

 4      Q.   Okay.  You all acquire servicing rights on

 5   Fannie Mae loans, but you don't acquire them one at

 6   a time, correct?

 7      A.   "One at a time," what do you mean by that,

 8   by one loan at a time?

 9      Q.   There's not an agreement in place that --

10   that has only the Hagers' loan, for example, that

11   says we're going to acquire the servicing rights to

12   this one loan, you acquire portfolios or pools of

13   loans?

14      A.   That's correct.

15      Q.   Okay.  And those portfolios and pools of

16   loans are generally categorized by certain criteria?

17           MR. MINOR:  Object to the form.

18      A.   Not to my knowledge.

19      Q.   Okay.  Well, let's talk specifically then

20   about the -- the acquisition of the servicing rights

21   to the Hagers' loan.  And that was in 2012?

22      A.   We service transferred October 2012.

23      Q.   Okay.  Now, what was acquired?  Was it a --

24   the pool that was generated when the Hagers first

25   originated their loan in 2006 or was there some sort

1      of grouping that was done after 2006 that was

2      acquired by Seterus?

3         A.   Seterus is -- when we receive portfolios of

4      loans, they're not identified by any specific

5      outlier.  They receive a pool of loans.

6              And in the Hagers' matter, in the Hagers'

7      loan, that was one pool of loan that Seterus had

8      received from Bank of America.

9         Q.   Okay.  And does that pool have any -- does

10     it have a name?

11        A.   I wouldn't be able to answer that question.

12     I didn't review that portfolio.

13        Q.   Does it have an identifying characteristic?

14        A.   To my knowledge, it's just a portfolio.

15     It's just a pool of loans.

16        Q.   Okay.  Do you know how it was pooled?

17        A.   Like I just answered, I don't believe that

18     there are any certain outliers that identify pools

19     of loans.

20        Q.   Okay.  Well, let's -- let's take a step back

21     then.

22              Okay.  How does Seterus determine whether

23     they're going to acquire the servicing rights to a

24     certain pool of loans?

25        A.   Seterus doesn't make that determination.

1      Federal National or Fannie Mae is the owner and

2      investor of the loans, and so it is their

3      determination upon which Seterus will service a pool

4      of loans.

5          Q.   Well, Seterus has to say yes, we want this

6      pool, correct?

7          A.   We -- we do run -- we do have a boarding

8      process and we will service loans that we deem are

9      serviceable.  And -- and what I mean by that is that

10     there is an origination file.  If there is a note

11     and mortgage that we can review the arrears on an

12     account or the total unpaid principal balance, then

13     we can run those numbers and check to see if it is a

14     loan that we want to -- to service.  And -- and that

15     is our -- the determination that we make.

16         Q.   On a loan-by-loan basis?

17         A.   We run -- it -- it's a boarding group.  Our

18     boarding group runs that analysis.

19         Q.   Okay.  Are you able to provide more details

20     than that regarding the process of acquiring

21     servicing rights to pools of loans from Fannie Mae?

22         A.   I mean, I -- I have my knowledge that I --

23     that I can relate to you.  Anything outside of that,

24     you would have to reach -- reach out to counsel to

25     see if they're able to provide it to you.

1      Q.   Well, let's look at Exhibit 1 again.  Back

2    to page 5.  We did number 1.  Now, let's

3    do number 2.  Do you see number 2?

4      A.   I do.

5      Q.   Are you able to answer questions regarding

6    topic number 2?

7      A.   I am.

8      Q.   And so there's some references to Seterus

9    servicing loans that are acquired while in a state

10   of default.  Do you see that in topic 2?

11     A.   I do.

12     Q.   Is that an accurate statement, that Seterus

13   services loans that are -- servicing rights are

14   acquired while in a state of default?

15     A.   We service loans that are in current status

16   in different buckets of delinquency.  So it includes

17   loans where customers are in default, but we -- but

18   we mortgage service all -- all the loan -- all of

19   our loans.

20     Q.   Okay.  So the pool that you acquire from

21   Fannie Mae might include current loans, but it might

22   include loans that are one day late, 30 days late,

23   90 days late?

24     A.   Correct.

25     Q.   Do you all have an opportunity to review

1      which specific loans before you make a decision as

2      to whether or not you are going to service that

3      pool?

4           A.   I'm not in the decision-making realm, so I

5      can't speak to that.

6           Q.   Who would that be?

7           A.   I'm sure it would just be, you know, our

8      corporate managers.  I'm not...

9           Q.   Okay.  Are you able to testify on behalf of

10     Seterus regarding generally the percentages

11     approximately as to what's current, what's one day

12     late, what's 30 days late, what's 90 days late?

13               MR. MINOR:  I want to object to the

14     form just as to when as to timing of those -- of

15     those delinquency statuses that you just listed.  Go

16     ahead.

17          A.   Would you rephrase it?

18          Q.   Sure.  Going back to number 2.

19          A.   Right.

20          Q.   Okay.  Looking at the third line, the -- the

21     phrase starting with "The composition."  Do you see

22     that?

23          A.   Yeah.

24          Q.   Okay.  So you are here to testify on behalf

25     of Seterus regarding:

1           "The composition of your loan portfolios,

2      including but not limited to the proportion of loans

3      that you own and/or service that were acquired while

4      in the state of default."

5           Are you capable of doing that?

6      A.   I am.

7      Q.   Okay.  Please tell me what the proportion of

8      loans that you own and/or service that were acquired

9      while in the state of default?

10     A.   Our loans, like I said, when we mortgage

11     service, they vary.  A customer can make a payment,

12     which will change the status of their loan.  So it

13     really just depends on -- I mean there -- it depends

14     on what day you're looking at.  There's not a -- I

15     wouldn't say that there is a specific percentage

16     that I could give you because a loan, it doesn't

17     stay stagnant.  In mortgage servicing, they

18     continue -- we're continuing to service them; we're

19     taking calls and taking payments, applying them to

20     the loan, et cetera.

21     Q.   Okay.  And I'm not asking you about what

22     happens once you've acquired the servicing rights

23     and somebody gets current.  I'm asking about the

24     acquisition of the servicing rates.  At that point,

25     what is the proportion of loans that the service

1    rates are acquired while in the state of default?

2        A.   Again, that could vary.

3        Q.   Roughly.

4        A.   Yeah.  I wouldn't -- I wouldn't be able to

5    give you a specific number because it can vary.

6        Q.   Okay.  What about the Hagers' pool?

7        A.   As I mentioned earlier, every -- every pool

8    -- to my knowledge, there is no outlier or

9    distinction made to any specific pool.  So they're

10   all one and the same.

11            When we -- we mortgage service the loans

12   that are given to us.  And so when they're

13   established, we make -- we start servicing them.

14       Q.   Okay.  So when you say there's no

15   distinction, what -- what do you mean?  No outlier,

16   what do you mean?

17       A.   There isn't -- we aren't asking for a

18   specific delinquency bucket of loans, if that...

19       Q.   Okay.

20       A.   Yeah.

21       Q.   The -- but some of them are delinquent?

22       A.   A portfolio can have, like I said, current,

23   and it can vary in stages of delinquency, correct.

24       Q.   Have you ever heard the term "specialized

25   servicer"?

```
1        A.   I want to say I have, but I don't know much

2   about that.

3        Q.   My understanding of the term specialized

4   servicer is it refers to a servicer that acquires

5   loans that -- the portfolios are -- the loans are

6   primarily in default --

7        A.   Okay.

8        Q.   -- and they are specializing in that sort of

9   loan.  Would you say, given that definition, that

10  Seterus is a specialized servicer?

11       A.   Seterus is not a specialized servicer.

12       Q.   Okay.  If -- loans are originally pooled

13  based upon when they were originated; is that fair?

14            MR. MINOR:  Object to the form.

15       A.   Can you restate that?

16       Q.   Sure.  I'll represent to you the Hagers'

17  loan was in 2006 --

18       A.   Correct.

19       Q.   -- by E-Loan.

20       A.   That's correct.

21       Q.   Okay.  And then E-Loan transferred the

22  servicing rights immediately to Countrywide; is that

23  correct?

24       A.   I'm going to go on your assumption.  I

25  didn't review that sets of records.
```

1       Q.    Okay.  And Countrywide, before they went

2    under, securitized the loans into a pool based upon

3    certain criteria, such as credit score and amount of

4    the home and the interest rate and the date that the

5    loan was originated, and they would make -- they

6    would make securitization pools based upon those

7    categories.

8                MR. MINOR:  I'm going to object to the

9    form and the witness's ability to answer that

10   question and not being identified in the Notice.

11   But of course, to the extent she can answer, please

12   do.

13      Q.    Do you have an understanding about -- about

14   that?

15      A.    About specifically Countrywide's association

16   about --

17      Q.    Basically I just want to know if this is the

18   same pool that it was in 2006.  Because I don't need

19   you to -- I know about that, but I just want to know

20   if it's a different pool.

21                MR. MINOR:  Object to the form.

22      Q.    Do you know?

23      A.    Like I said, the pool came -- there was no

24   specific outlier, there was no specific distinction

25   to the pool that we service.  And the Hagers' loan

1    was in one such pool.

2        Q.   Okay.  Is -- I'm assuming you -- Seterus

3    received some sort of documentation from Fannie Mae

4    regarding the specifics of the pool.

5        A.   We correspond with the prior servicer, Bank

6    of America, before we receive a pool of loans and

7    we'll run, you know, a prelim --

8        Q.   Preliminary.

9        A.   -- preliminary, preliminary, secondary, and

10   a tertiary audit on them.  And so, like I said

11   earlier, the -- the reasons for those audits is just

12   to maintain that the -- the loan is in a condition

13   that we can service, meaning that there are no

14   missing documents, gaps in the loan, that wouldn't

15   allow us to conduct a full servicing of the loan.

16   And that really is the -- the spectrum.  Or

17   that's -- those three audits are what we conduct in

18   terms of servicing a loan.  Outside of that, you

19   know, Fannie is the investor --

20       Q.   Okay.

21       A.   -- on the loan and that's it.

22       Q.   Okay.  So you correspond with the previous

23   servicer regarding this pool or portfolio?

24       A.   That's correct.

25       Q.   Okay.  They provide you with the

1     information?

2          A.   With data points, correct.

3          Q.   With data points.  What is contained in the

4     data points?

5          A.   Just the loan status as it sits.  Like I

6     said earlier, the unpaid principal balance, the date

7     of origination, the total number of payments made,

8     the customers' documents, the underwriting

9     documents, et cetera.

10         Q.   And is that sent by an email or is that sent

11    by some sort of software program?

12         A.   It's a CD that we receive.

13         Q.   Okay.  So they send an electronic CD that

14    has these data points on it?

15         A.   That's correct.

16         Q.   Okay.  And then you all conduct preliminary,

17    secondary, and tertiary audits regarding the data

18    points on that CD?

19         A.   That's correct.

20         Q.   And then you all make a decision about

21    whether or not you want that portfolio?

22         A.   No.

23         Q.   No?

24         A.   We review it for completeness.  If there are

25    any issues with the loan in terms of, like I said,

1    there are any gaps that wouldn't allow servicing of

2    the loan, we will send it back to Bank of America or

3    the prior servicer.  If there are no issues with the

4    loan, we will onboard it, onboard the loan.

5       Q.   Okay.  So the audits are designed to check

6    that the data points on the CD are full and

7    complete?

8       A.   That's correct.

9       Q.   And if they're full and complete, you will

10   onboard it?

11      A.   Correct.

12      Q.   And that -- and what does "onboard" mean?

13      A.   Start servicing.

14      Q.   Okay.  And is there some sort of underlying

15   agreement with Bank of America either with regard to

16   this portfolio or portfolios generally that governs

17   that process?

18      A.   We are -- like I said, Seterus is a servicer

19   for Federal National Mortgage Association, so

20   whatever servicing guidelines -- servicing

21   guidelines that they have mandated is what we

22   follow.

23      Q.   Well, not so much the -- the servicing

24   guidelines and the guidelines for how you go about

25   servicing the loans, but I'm assuming there's some

1    sort of document generated that oversees the

2    transaction of transferring from Bank of America to

3    Seterus?

4                 MR. MINOR:  I'm going to object on the

5    grounds that this is somewhat far afield of the

6    Notice.  But again, to the extent you can answer,

7    please do.

8        A.   Again, I've answered to the best of my

9    knowledge in terms of what I know about the boarding

10   process and the servicing of this loan.

11       Q.   Let's go back to the Notice.  If you could

12   turn to page 6.

13       A.   Yes, sir.

14       Q.   And look to paragraph 15.  Do you see that?

15       A.   I do.

16       Q.   Okay.  And it says:

17            "Information concerning the specific

18   background and history of the loan and Seterus'

19   purchase and servicing of the same, including

20   detailed background regarding the circumstances

21   surrounding your acquisition of the Debt."

22            Do you see that?

23       A.   I do.

24       Q.   Are you prepared to testify about that?

25       A.   I am.

1      Q.   Okay.  Tell me about the specific background

2      and history of the loan and Seterus' purchase and

3      servicing of the same, while please providing

4      detailed background regarding the circumstances

5      surrounding your acquisition of the debt.

6                  MR. MINOR:  Object to the form.

7      Compound question.

8                  MR. MAGINNIS:  Let's go off for a

9      second.

10            (Discussion was held off the record.)

11                 MR. EDWARDS:  Back on at 10:32.

12     BY MR. MAGINNIS:

13     Q.   Okay.  Ms. Jacob can --

14     A.   Yes.

15     Q.   -- let me rephrase the question.

16            Can you provide me with the details of how

17     the process works in terms of taking it from Bank of

18     America servicing to Seterus servicing just for the

19     Hagers' pool?

20     A.   And like I --

21                 MR. MINOR:  Object to the form.

22     A.   Like I said earlier, there are no specific

23     distinctions for any one pool.  The Hagers' loan was

24     part of a pool that Seterus received.  Federal

25     National is the investor on the loan, was the

35

1     investor when Bank of America was servicing the

2     loan.  And it was just a service transfer from Bank

3     of America to Seterus.

4              And that -- and I explained to you that in a

5     boarding process, we run just data points on the

6     pool, not specific to any loan.  Again, the Hagers'

7     loan was the one loan within the pool.

8        Q.   Who makes the decision regarding that the

9     servicing rights to the pool are going to be

10    transferred?  Who decides that that's going to

11    happen?

12              MR. MINOR:  Object to the form.

13       A.   I stated earlier, it would be -- not me, it

14    would be in management.  It would be a decision made

15    by Federal National, by Bank of America management

16    and Seterus management.

17       Q.   Is that pursuant to some sort of written

18    agreement between one or any of those parties?

19       A.   Not that I --

20              MR. MINOR:  Object to the form.

21       A.   Not that I know of.

22       Q.   Okay.  So you don't have any knowledge about

23    the underlying business agreements between any of

24    those parties that might lead to the servicing

25    rights being transferred?

```
 1                    MR. MINOR:  Object to the form.
 2         A.   Outside of the servicing guide, that Federal
 3    National Servicing Guide is what we use to service
 4    loans.  Outside of that, no.
 5         Q.   Okay.  And is there anything in the Fannie
 6    Mae Servicing Guide that talks about acquiring a
 7    portfolio, the decisions regarding acquiring a
 8    portfolio, or do those just govern what to do once
 9    you've acquired the servicing rights?
10         A.   The -- do you have the Servicing Guide with
11    you?  I mean I don't -- I can't pinpoint to any
12    specific --
13         Q.   Well, let's just --
14         A.   -- page of paragraph without it.
15         Q.   Other than the Servicing Guide, Fannie Mae
16    Servicing Guide, are you aware and prepared to
17    testify on behalf of Seterus regarding any other
18    documents that governed the transfer of the
19    servicing of the loan?
20         A.   For the Hagers' loan, it would be the Deed
21    of Trust, and the Note, and the Fannie Mae Servicing
22    Guide.
23         Q.   Okay.  Other -- and I know the Note and the
24    Deed of Trust govern the Hagers' loan specifically,
25    but are you, on behalf of Seterus, prepared to
```

1      testify regarding any agreements that govern the

2      transfer of the pool of loans?

3                  MR. MINOR:  Object to the form.

4          A.   I mean, do you have a specific document that

5      you're referencing?

6          Q.   I'm asking you if you're aware of any?

7          A.   Again, if you have a specific document that

8      you're referencing, I can take a look at that.

9          Q.   Okay.  But you're, sitting here today, not

10     aware of what documents might govern the transaction

11     of transferring servicing rights from Bank of

12     America to Seterus?

13         A.   If you have a document that you can present,

14     then I can review it.

15         Q.   Well, let me -- let me ask the question

16     again.  Are you aware -- I mean, and if -- and if

17     the answer is no, then that's okay, but are you

18     aware of any documents that govern the relationship

19     regarding the transfer of the servicing rights of

20     the pool?

21         A.   I think I've answered, you know, with the --

22     the three documents that I mentioned.  And then if

23     there are additional documents, if you would provide

24     them, then I can refer to -- or reference them.

25         Q.   Okay.  When you receive the data points on

1      the CD --

2          A.   Correct.

3          Q.   -- is it just like a spreadsheet or what --

4      what is -- how are the data points contained?

5          A.   I have a general knowledge.  I haven't

6      worked in the data boarding department.  My

7      understanding is the data points are received in a

8      readable format.  They review it for accuracy.

9          Q.   The notes are not contained on the CD?

10         A.   Again, I have a very general knowledge of

11     it.  They are readable.  Our employees are able to

12     read and decipher them.

13         Q.   Okay.  What do they read?

14         A.   To my knowledge is, as -- as I stated

15     before, the general points of the -- of the loan,

16     the unpaid principal balance, the history of the

17     loan, et cetera.

18         Q.   And is that on a chart or a spreadsheet or

19     does each loan have a little folder that has

20     documents in it; do you know?

21         A.   Again, no, I don't.

22         Q.   Okay.  Do you know if Seterus, when they

23     were reviewing the data points for completeness, had

24     access to the Hagers' Note?

25         A.   We had the preliminary -- excuse me,

 1    preliminary data points.  At point -- when the data

 2    points came over, we were not servicing the loan, so

 3    the servicer who was servicing would have had their

 4    original Note and mortgage and original underwriting

 5    documents.

 6        Q.   Okay.  So when you were making the decision,

 7    reviewing the data points for completeness, Seterus

 8    did not have the Note?

 9        A.   Before boarding -- yeah, before service

10    transfer.  And I don't know when it -- I don't have

11    a specific date of when it -- when this review

12    occurred.  Like I said, I have a very general

13    understanding of it.  We're just reviewing the loan

14    for its -- we're reviewing the portfolio or pool of

15    loans for accuracy.

16        Q.   Okay.  So you don't have the physical Note

17    at that point?

18        A.   For when we're not servicing, no, we don't.

19        Q.   Okay.  You don't have the physical Deed of

20    Trust at that point?

21        A.   Before service transfer, we don't.

22        Q.   Okay.  After the service transfer -- how

23    does that -- how does that happen, the service

24    transfer?  What -- how does that work functionally?

25    You've said you've reviewed the data points, you've

```
 1      done preliminary, secondary, and tertiary audits,

 2      and so now you all are going to begin servicing.

 3      What happens to effectuate that?

 4          A.   We send out our welcome letter to the

 5      customer.  The prior servicer will send out their

 6      goodbye letters.  And then our custodians or our --

 7      we have a custodian department.  All the original

 8      documents or any documents associated with the loan

 9      will be transferred over to our custodian.

10          Q.   Okay.  So they would be in like a warehouse

11      somewhere so you can access them?

12          A.   That's correct.

13          Q.   Okay.  They're not automatically reviewed,

14      but they are made available so that if you need to,

15      you can review them?

16          A.   I'm not -- I don't work in that department,

17      so I couldn't speak to the specifics of if they are

18      reviewed.

19          Q.   Well, when Seterus acquires the servicing

20      rights, is there any procedure where the Note is

21      reviewed before the servicing begins?

22          A.   I don't have any specific knowledge to that.

23          Q.   Okay.  Is there a procedure where the Deed

24      of Trust is reviewed before the servicing begins?

25          A.   Again, our custodian department and our
```

41

1     boarding department do review the original

2     documents.  I, in my job function, do not, so I

3     couldn't speak to that.

4          Q.   Well, they receive them, but do they review

5     them?

6               MR. MINOR:  Object to the form.

7          A.   Again, like I said, in my job function and

8     duties, I have a very general knowledge and they --

9     it is my understanding that they review it.

10         Q.   Every loan?

11         A.   Again, I don't -- it's just general

12    knowledge that I know.

13         Q.   Well, Ms. Jacob, I -- you know, as much as I

14    like you, I'm not interested in what you have to

15    say.  I'm interested in what Seterus has to say.  So

16    you're here on behalf of Seterus.

17              So on behalf of Seterus, does Seterus know

18    whether or not individual notes and deeds of trust

19    are reviewed upon the transfer of servicing rights?

20         A.   Again, it would be a case-by-case basis, so

21    if there is a need for it to be reviewed, then it

22    will be reviewed.

23         Q.   Okay.  So it's not automatic, but if they

24    need it, you know where it is and you could get it?

25         A.   Correct.  That's correct.

1          Q.   Okay.  But specific terms -- what would be

2     in -- you may have already said this, but do you

3     have an understanding of what is contained in the

4     data points that are reviewed?

5                    MR. MINOR:  Object to the form.

6          A.   I have a general understanding.  Like I said

7     earlier, the data points consist of the total loan

8     balance, the history of the loan.

9          Q.   Let me stop you there.  History of the loan,

10     what -- what would that contain?

11          A.   Transactions made, any charges assessed,

12     total amounts due.

13          Q.   Okay.  So payments and credits and debits on

14     a particular loan?

15          A.   Is one -- one area, correct.

16          Q.   Okay.  History of loan, loan balance, what

17     else?

18          A.   And then general servicing of the loan and

19     all that it incorporates.

20          Q.   Well, what would be -- what data points

21     would be in that?

22          A.   It could be contacts, customers' addresses,

23     personal information on the -- on the loan.

24          Q.   Contact information?

25          A.   Correct.

43

```
 1        Q.   Name?

 2        A.   Correct.

 3        Q.   Address?

 4        A.   Uh-huh.

 5        Q.   Okay.  Anything else?

 6        A.   I mean, it's a large loan file.  I'm giving

 7   you an idea of what it could encompass.  I don't

 8   have -- I haven't memorized the entire list.

 9        Q.   Rate, would that be one of them?

10        A.   Sure.

11        Q.   Anything else that you can think of?

12        A.   Again, like I said, the data points

13   encompass the total loan and all the details

14   associated with it.  So the information from the

15   Note, the interest rate, the term, the total loan

16   origination amount, values that are conducted,

17   property inspections that are conducted.  These are

18   just examples of the data points that could come

19   across.

20        Q.   Anything -- I know the Note and the Deed of

21   Trust are not included in the data points, but

22   anything regarding language in the Note or the Deed

23   of Trust that would be included in the data points?

24        A.   I don't believe I said that the Note and

25   Deed of Trust is not associated in the data points.
```

44

1    They are the binding documents that make up the

2    loan, so they are there.

3        Q.   Well, they're not -- they're not -- and I

4    don't mean to put words in your mouth, but

5    they're -- I think you said that they're not

6    provided when you're doing the audits.

7        A.   Okay.  So are you -- are you referencing

8    after loan servicing or are you referencing before?

9    I'm confused.

10       Q.   Before.  I'm talking about when you review

11   it, other than loan balance, loan history, contact

12   information, the rate, maybe the payment amount,

13   what else is in the data points?

14              MR. MINOR:  Object to the form.

15       A.   As I -- as I stated, generally all the

16   loan -- all the loan amounts, the numbers associated

17   with the loan, which include, the rate, not limited

18   to the items that I said, but include those items.

19       Q.   Okay.  Anything else?

20       A.   From memory, I couldn't -- these are what I

21   can remember.

22       Q.   Okay.  All right.  Let's shift gears a

23   little bit.

24              How many loans does Seterus service

25   currently?

```
 1                    MR. MINOR:  Object to the form.

 2         A.   I want to say upwards to 500,000.

 3         Q.   Okay.  500,000 different loans?

 4         A.   More than that, I'm sure.

 5         Q.   And has that increased over the past few

 6    years?  Is it about the same?  Decreased?

 7         A.   It constantly flows.

 8         Q.   Well, if it's 500,000 now, would you have a

 9    sense of what it might have been in -- in 2012?

10         A.   I don't.

11         Q.   Okay.  Would it have been close to that?

12         A.   I don't -- I couldn't say.

13         Q.   Okay.  Would it have been more than 400,000?

14         A.   Again, I -- I wouldn't be able to say.

15         Q.   But it's 500,000 now approximately?

16         A.   I said upwards or more than that.

17         Q.   It could be more than that?

18         A.   Uh-huh.

19         Q.   Could it be more than a million?

20         A.   I wouldn't be able to say.

21         Q.   Well, how did you come up with 500,000?

22         A.   The last time I was -- I reviewed it, that

23    was the last number that I -- that I had heard.

24         Q.   When was that?

25         A.   I want to say last year.
```

46

1       Q.   Okay.  So it was about 500,000 in 2015?

2       A.   Correct.

3       Q.   Okay.  What is the size of the -- when you

4    reviewed it in 2015, would you also have had

5    information about the size of the portfolio?

6       A.   Those are all --

7            MR. MINOR:  Object to the form.

8       A.   Those are all the loans that we -- that we

9    service, so I don't know.  Are you asking about a

10   specific portfolio?

11      Q.   No.  Maybe that was a poor question.

12           The -- the total value, principals,

13   principal value of these 500,000 loans, what would

14   be the sum total of those --

15           MR. MINOR:  Object to the --

16      Q.   -- approximately?

17           MR. MINOR:  Object to the form.

18      A.   I don't know.

19      Q.   Okay.  Would you agree that one of the ways

20   in which Seterus generates revenue is they receive a

21   percentage of the total principal balance on their

22   loans?

23           MR. MINOR:  Object to the form.

24      A.   I can't make that determination.  I don't

25   know.

1      Q.   You don't know if that's true or not?

2      A.   I don't.

3      Q.   Okay.  Well, let me ask it this way:  How

4  does Seterus make money?

5           MR. MINOR:  Object to the form.

6      A.   Again, I'm here to speak about the specific

7  case and the items that are in the deposition

8  Notice.  If you want to ask me a specific question

9  regarding this specific case, I can answer that.

10      Q.   If you could go back to the Notice, back to

11  page 5, paragraph 2.  And if you look at the

12  phrase -- the last phrase of paragraph 2 beginning

13  with "And basic information."

14      A.   Okay.

15      Q.   Do you see that?

16      A.   Yeah.

17      Q.   And so one of the topics in which we asked

18  you to be prepared to testify about or asked Seterus

19  to be prepared to testify about was:

20           "Basic information pertaining to the revenue

21  and/or profit generated from the same," with "the

22  same" being servicing of debts, right?

23      A.   I read that.

24      Q.   Okay.  Are you able to testify with just

25  basic information regarding the revenue and/or

48

```
 1    profit that Seterus makes?
 2                 MR. MINOR:  Object to the form.
 3        A.   Again, Seterus is a mortgage -- I mean we
 4    service loans.  That's what we do.  So I don't know
 5    how revenue is generated specifically.
 6        Q.   Okay.
 7        A.   But that is our company product or that's
 8    what we do, we mortgage -- service mortgage loans.
 9    I -- my understanding is limited to that.
10        Q.   And you -- you service pursuant to the
11    Fannie Mae servicing guidelines?
12        A.   Correct.
13        Q.   Okay.  And is there any other servicing
14    agreement that you all service the loans pursuant
15    to?
16        A.   That is the main servicing guide that we --
17    that we use.  I don't know of any other one.
18        Q.   Okay.  Like you wouldn't use the servicing
19    agreement from way back when a loan was originated;
20    you wouldn't use that?
21        A.   A Note and the -- and the Deed of Trust and
22    what -- and the paragraphs that are maintained in
23    the Note and Deed of Trust, they do affect the way
24    that the loan is serviced.
25        Q.   Sure.  And maybe that was a poor question.
```

49

```
1              Have you ever heard the term of a "master
2    servicing agreement"?
3        A.   I haven't.
4        Q.   Okay.  I'll represent to you that the term
5    "master servicing agreement" refers to an agreement
6    that sets forth the servicing rights for a pool of
7    loans.
8        A.   Okay.
9        Q.   Okay.  So within that master servicing
10   agreement, it -- because it's going to investors, it
11   sets forth how the servicer gets paid.
12       A.   Okay.
13       Q.   Have you ever seen anything like that
14   before?
15       A.   No, I haven't.
16       Q.   Have you ever reviewed the portion of the
17   Fannie Mae servicing guidelines that address how
18   servicers get paid?
19       A.   Do you have -- do you have it with you that
20   I can reference?
21       Q.   I'm just asking if you've reviewed it.
22       A.   I mean, I don't -- if I don't see it, I
23   don't -- I'm not sure if I could speak to it.
24       Q.   Well, I'm not asking you to speak to it.
25   I'm just asking if you've ever reviewed it.
```

1       A.   I'm sure I have.  I just don't have it with

2   me to reference.

3       Q.   Okay.  But -- well, we talked -- it's the

4   Fannie -- what governs the servicing is the Note,

5   the Deed of Trust, and the Fannie Mae Servicing

6   Guide, correct?

7       A.   Correct.

8       Q.   Okay.  So are you aware of any terms in the

9   Note that reflect what the servicer gets paid?

10       A.   To the best of my knowledge, no.

11       Q.   Are you aware of any terms in the Deed of

12   Trust that reflect how the servicer gets paid?

13       A.   To the best of my knowledge, no.

14       Q.   Are you aware of whether there's terms in

15   the Fannie Mae servicing guidelines that discuss how

16   the servicer gets paid?

17       A.   Again, the servicing guideline is a large

18   document.  If there's a specific --

19       Q.   Yeah.  It's really long.  It's like a

20   thousand pages.

21       A.   Yeah.

22       Q.   Okay.  But you're -- so you -- you are not

23   aware of how Seterus gets paid on -- for the

24   servicing of an individual loan?

25       A.   Of an individual loan, no.

```
 1        Q.   Okay.  And you're not aware of how Seterus

 2   gets paid for the servicing of a pool of loans?

 3        A.   Outside -- outside of the fact that we

 4   service the loans, no.

 5        Q.   Okay.  And are you able to testify regarding

 6   Seterus' revenue from 2015?

 7        A.   I am not able to.

 8        Q.   Can you ballpark it?

 9             MR. MINOR:  Object to the form.

10        A.   I wouldn't be able to, no.

11        Q.   Do you know if it's billions of dollars?

12        A.   Again, I would --

13             MR. MINOR:  Object to the form.

14        A.   -- I would not want to make that

15   determination.

16        Q.   Okay.  Do you know what the average size

17   loan Seterus holds among its 500,000 loans, the

18   average size of the loan?

19        A.   Are you talking about the total amount due?

20        Q.   Uh-huh.

21        A.   It could vary, like I said.  When a customer

22   makes a payment, it could -- it just varies.  It

23   depends on the time that you look at the -- look at

24   a specific loan.

25        Q.   Oh, yeah.  I understand that a loan -- that
```

```
 1        the balance, the amount owed can go up and go down

 2        depending on if the customer pays or not.

 3            A.   Right.

 4            Q.   But I'm asking if you are aware of what the

 5        average size amount due and owing is on these

 6        500,000 loans?

 7            A.   I don't -- I don't believe that we keep

 8        records like that.

 9            Q.   Okay.

10            A.   We service -- we service mortgage loans.

11        They come in.  There's no specific outlier.  We

12        service them as they come in.  We make sure that

13        they are serviceable, and then here we are.

14            Q.   But you don't know whether Seterus gets a

15        percentage of the total principal balance on a

16        particular loan as payment for servicing?

17            A.   Not that I know of.  I don't know.

18            Q.   And you don't know then what the percentage

19        might be?

20            A.   I don't.

21            Q.   Okay.  And -- and you don't know whether

22        Seterus gets to keep any late fees that are -- are

23        assessed and paid?

24            A.   Are you talking about this specific loan?

25            Q.   I'm talking about Fannie Mae loans
```

53

```
 1    generally.
 2                MR. MINOR:  Object to the form.
 3         A.   Again, if it's this specific loan, I can
 4    speak to it.  If you want to know something specific
 5    about late charges, ask me and I will let you know.
 6         Q.   Okay.  Let's talk about this specific loan.
 7              What does Seterus make on this specific loan
 8    as a payment for servicing it?
 9                MR. MINOR:  Object to the form.
10         A.   I believe you're asking me about revenue and
11    I -- I couldn't tell you about revenue.
12         Q.   Okay.  If the Fannie Mae guidelines do
13    address how servicers can get paid, would you have
14    any reason to dispute that?
15         A.   I wouldn't.
16         Q.   Okay.  If the Fannie Mae guidelines do
17    address how servicers get paid, would Seterus aim to
18    follow that?
19         A.   Seterus would follow the Fannie Mae
20    servicing guidelines, yeah.
21         Q.   Okay.  So if the Fannie Mae servicing
22    guidelines set forth how servicers get paid, that
23    would be how Seterus gets paid?
24         A.   I would you agree with that, yes.
25         Q.   And Fannie -- they only do Fannie Mae owned
```

54

```
1    loans?

2        A.    That's correct.

3        Q.    So there is no other document that would set

4    forth how they get paid?

5        A.    No.

6        Q.    Okay.  But you don't -- you know there's --

7    at least in 2015, you know there were 500,000 loans,

8    but you don't know what the total principal balance

9    of those $500,000 (sic) loans is?

10                 MR. MINOR:  Object to the form.

11       A.    Again, I didn't say that that was

12   specifically 500,000.  It could be upwards -- my

13   answer was upwards of 500,000.  That's just in my

14   general understanding.

15       Q.    Okay.  Yeah.  And, you know, I'm not looking

16   for 508,426 --

17       A.    Right.

18       Q.    -- right, I get it.  I'm just trying to get

19   a sense of how Seterus makes money and -- and what

20   they make.  I mean that was one of the topics that

21   we asked you to be prepared to testify about.  But

22   you are not able to testify about Seterus' revenue?

23       A.    We are a mortgage servicing company.

24   Obviously, we are making -- you know, obviously

25   we -- we are continuing to service.  I don't know
```

55

1          the specifics about a specific loan or a pool of

2          loans or a monetary value assessed to that.  I do

3          not know.

4               Q.   Okay.  Or even generally, you don't -- you

5          don't have any information about that generally

6          either, correct?

7               A.   Correct.

8               Q.   Okay.  What -- what does Seterus do to

9          ensure that they comply -- strike that.

10                   We talked about the Note, the Deed of Trust,

11         and the Fannie Mae servicing guidelines being the

12         governing documents for any individual loan.

13              A.   Correct.

14              Q.   Okay.  What does Seterus do to ensure

15         compliance with those three documents in the

16         servicing of any one particular loan?

17              A.   We have set our mortgaging service to follow

18         those three documents.  So our procedures are in

19         step with all of those three documents.

20              Q.   Okay.  Procedures, do you mean written

21         procedures?

22              A.   Written or any communications we have or

23         servicing of the loan, transaction history is the

24         way we upkeep it.

25              Q.   Okay.  So is there some sort of

56

1    underlying -- I'm assuming there's some sort of

2    software program that's utilized.

3       A.   We use MSP as our servicing tool.

4       Q.   Do you license that or own it?

5       A.   I don't know the answer to that question.

6       Q.   Is MSP something proprietary that Seterus

7    created or is it somebody else's product?

8       A.   I believe it's an industry-wide used

9    product.

10      Q.   So you guys use the software MSP to service

11   the loans?

12      A.   Correct.

13      Q.   Okay.  And you have written procedures

14   designed to ensure compliance with the Note, Deed of

15   Trust, and Fannie Mae servicing guidelines?

16      A.   Correct.

17      Q.   Okay.  What sort of -- what sort of written

18   procedures are there?

19      A.   Excuse me.

20      Q.   And if you need to take a break.  I didn't

21   include that in the original instructions, but if

22   you do need to take a break at any time, just let me

23   know, and I just ask that you finish the answer to

24   any pending question.

25      A.   Thank you.

57

1            The written procedures stem from -- I mean,

2      I hate to sound like a broken record, but it really

3      does stem from those three documents, which is the

4      Note, the Deed of Trust, and the Fannie Mae

5      guidelines.

6          Q.   Well, there wouldn't be a written procedure

7      created for each individual note, right?

8          A.   No.

9          Q.   Okay.  Or each individual Deed of Trust?

10         A.   No.

11         Q.   Okay.  So the written procedures are

12     intended to line up with the Fannie Mae servicing

13     guidelines?

14         A.   And they will take into account the language

15     that is written in the Deed of Trust and the Note.

16         Q.   Okay.  Give me an example of that.

17         A.   That when a payment is made that it's posted

18     to the account at the time that it was made.

19         Q.   Okay.  How is that -- how is that entered

20     into MSP what an individual Note or Deed of Trust

21     says?

22         A.   So when a payment is made, so say, for

23     example, a payment is made over the telephone, once

24     that payment is processed and it comes through, then

25     it would be entered into the transaction history.

58

```
 1        Q.    Okay.  Let's say hypothetically one Note

 2    says payment -- post the payment on the day it's

 3    received, to use your example, and another Note says

 4    post the payment within three days of it being

 5    received -- I don't know if that would ever be in

 6    the Note, but how -- how would MSP or Seterus

 7    distinguish between the language of an individual

 8    Note?

 9        A.    We have procedures in step with each

10    specific state.  So a Note is generally a result of

11    the state that they are originated in.  And

12    therefore, there are -- we -- the differences in our

13    procedures essentially stem from those different

14    state guidelines as well.

15        Q.    Right.  So each state usually has kind of a

16    Uniform Note and a Uniform --

17        A.    Correct.

18        Q.    -- Deed of Trust?

19        A.    Uh-huh.

20        Q.    And particularly if they want to be in

21    compliance with Fannie, they have a uniform Fannie

22    Note and a Uniform Fannie Deed of Trust?

23        A.    The states do, yeah.

24        Q.    Right.  And so you all are aware of what

25    those -- to use North Carolina --
```

59

```
1        A.   Correct.

2        Q.   -- you are aware of what the --

3        A.   Correct.

4        Q.   -- North Carolina Uniform Fannie Mae Note

5    says?

6        A.   We would have procedures and policies in

7    place to comply with the State of North Carolina,

8    for example.

9        Q.   Right.  So that there are policies and

10   procedures in place to account for the individual

11   language in the uniform North Carolina Fannie Mae

12   Note?

13       A.   Yes.

14       Q.   And the Uniform North Carolina Fannie Mae

15   Deed of Trust?

16       A.   Correct.

17       Q.   And so the policies and procedures are

18   designed to account for those uniform documents?

19       A.   Correct.

20       Q.   And so everybody -- the -- the system is set

21   up to automate and deal with everybody the same

22   based upon those notes?

23       A.   The system is set up to deal with the states

24   as -- as they require.

25       Q.   Right.  But everybody --
```

1     A.   So a state -- like in Texas, it wouldn't be

2     the same in terms of a customer's spouse that might

3     call in as opposed to the state of North Carolina,

4     for example.

5     Q.   Right.  But in North Carolina, the Note and

6     Deed of Trust, everybody would be -- the system

7     would treat everybody in North Carolina the same?

8     A.   It should.

9     Q.   It would -- it would have a standard North

10    Carolina document and it would operate pursuant to

11    that North Carolina document?

12    A.   Correct.

13    Q.   Okay.  There wouldn't be -- the Hagers, for

14    example, being in North Carolina, might be different

15    from how you all deal with your Idaho loans, but it

16    would be the same as everybody in North Carolina?

17    A.   It should be, yes.

18    Q.   Okay.  And that's true today and was true in

19    2012?

20    A.   Yes.

21    Q.   And every year since?

22    A.   Yes.

23    Q.   Okay.  Are there written policies and

24    procedures, to the extent they exist, state specific

25    or not?

1      A.   State specific?

2      Q.   Yeah.

3      A.   And that state would require a certain

4  specific policy or procedure, yes.

5      Q.   So, for example, is -- would there be a

6  written policy and procedure that discusses form

7  letters to people in North Carolina?

8      A.   If the State of North Carolina requires

9  that, then yes.

10          For example, I was just thinking, like the

11  State of Wyoming or -- if -- if there are no

12  outliers, if there's no specific procedures or

13  policies, then it would be the -- the Fannie Mae

14  servicing guidelines which -- and the Note and the

15  mortgage or the Deed of Trust, which govern how the

16  mortgage servicing would have -- occur in those

17  states.

18          If there are any -- if there are any

19  specific compliance issues that need to be

20  addressed, then we will want to take those steps and

21  procedures to make sure that we are in compliance

22  with that state.

23      Q.   Well, and later we're going to look at kind

24  of this ledger that sets forth all of the

25  communications between Seterus and Hager that was

```
 1        produced to us in discovery.  And there was a form

 2        that was sent called "NC Final."  Is it fair to say

 3        that that was likely a North Carolina specific form?

 4           A.   Yes.

 5           Q.   Okay.  And that would be sent to everybody

 6        in North Carolina who it is -- it's -- you know,

 7        it's --

 8           A.   If it pertains to their -- their loan,

 9        correct.

10           Q.   If what they've done with regard to that

11        loan is to automatically generate the NC Final, they

12        get the NC Final?

13           A.   Right.

14           Q.   Okay.  But somebody in South Carolina might

15        not get that, they might get a different one?

16           A.   Correct.

17           Q.   Okay.  Is there -- what sort of discretion

18        do individual employees of Seterus have in terms of

19        the servicing or is it all automated pursuant to a

20        state, a specific state, policies and procedures?

21           A.   Could you expand on what you mean by

22        "discretion"?

23           Q.   Yeah.  Maybe that was a poor question.  I'm

24        trying.

25                The -- you talked about how MSP is uploaded
```

1    with specific policies and procedures to -- for

2    North Carolina borrowers.

3        A.   Correct.

4        Q.   Okay.  And so North Carolina borrowers all

5    are treated in MSP identically in terms of how to

6    record payments and how to send letters and things

7    like that?

8        A.   That's correct.

9        Q.   Okay.  Is there -- what sort of discretion

10   do individual employees of Seterus have to go

11   outside of MSP in terms of how they're interacting

12   with a customer?  Is it none or is it some?

13       A.   Could you use a different word other than

14   "discretion"?

15       Q.   What sort of -- let me just ask it this way:

16   Is it all -- is how Seterus deals with a North

17   Carolina customer all automated?

18       A.   No.

19       Q.   Okay.  How is it -- what situations is it

20   not automated?

21       A.   When a customer writes a qualified written

22   request, for example.

23       Q.   Okay.

24       A.   Our response would be specific to the

25   correspondence or the subject matter in that written

64

```
1      request.  And so we would address it, given the

2      policies and procedures in North Carolina, and then

3      answer the specific subject matters that was

4      addressed.

5          Q.   And when you say "qualified written

6      request," you're referring to a qualified written

7      request as defined by RESPA?

8          A.   Yeah.

9          Q.   Okay.  So when somebody submits a written

10     letter with specific questions about their loan,

11     those receive individualized attention and

12     individualized response?

13         A.   Yeah.  And not only -- that's one example.

14     Not only that, when a customer calls in, when a

15     North Carolina residence calls in, it's not an

16     automated response.  A customer service agent

17     tailors their response to the questions that are

18     posed by the customer.

19         Q.   Well, okay, that's a good point.  So when --

20     when they tailor their response, the words that are

21     used are -- are the customer service agent's own

22     words, it's not a computer, right?

23         A.   Correct.

24         Q.   Okay.  Are there actions automated in

25     that -- and I know you don't like the word
```

1    discretion, but if you can think of a better one,

2    let me know.  Take -- take late fees, for example.

3    Sometimes late fees get waived, sometimes they

4    don't.  Is that an individual's call or are there

5    written policies and procedures that say under X, Y

6    and Z, you can waive them, under A, B, and C, you

7    can't?

8        A.    I'm going to use a different example.

9        Q.    Okay.

10       A.    When speed pay payments are made.  For

11   example, a customer calls in and says I want to make

12   an automatic payment, generally there's a $10 fee

13   assessed with it.  It is a mandated fee that has to

14   be charged to each calling customer.  A customer

15   service agent can make that discretion to see if

16   they want to make that -- they want to apply the $10

17   fee or not.  It just kind of depends on that fee

18   specifically, if it's a first time caller.  So the

19   call team agent will make that discretion.

20            A late fee, in direct opposition to a call

21   service fee, is something that is outlined by the

22   Deed of Trust and the Note and the federal -- and

23   the Fannie Mae guidelines.  And so that is a fee

24   that's assessed outside of 15-day grace period.  It

25   is assessed to a loan when a payment is not received

1    on time.  But that is an automatic payment.  If we

2    don't receive -- if we don't receive a payment, then

3    it is assessed.

4          But someone -- but a -- someone can go back

5    and review those late payments and see if they need

6    to be removed.  And they can be removed.

7      Q.   Okay.  So two things.  Let's talk about

8    the -- the review as to whether or not to remove

9    them, okay.  And is that kind of similar to the

10   assessment of the $10 fee for the -- making the

11   phone -- payment by phone in that there's some --

12   some ability for the individual customer service

13   representative to make a decision?

14               MR. MINOR:  Object to the form.

15     A.   No.

16     Q.   No?

17     A.   And I -- my answer was that it's in --

18     Q.   Okay.

19     A.   -- direct opposition and is not associated

20   at all.

21     Q.   Okay.  So let's use your example of the $10

22   fee then.

23          Are there written procedures regarding when

24   you  -- if there -- it's their first time being

25   late, et cetera, are there written guidelines that

67

1      dictate whether the $10 fee is assessed or not?

2          A.   Let's leave the $10 fee -- I think that's

3      confusing you.  Just a late fee, right?

4          Q.   Okay.

5          A.   You're talking about a late fee.  There are

6      written guidelines for the late fee.  The late fee

7      is -- the guidelines are the -- the Deed of Trust --

8          Q.   Yeah.

9          A.   -- that outline when a late fee is assessed

10     for a monthly mortgage payment, for example.

11         Q.   Right.  So the assessment of the late fee is

12     automatic?

13         A.   Yes.

14         Q.   Okay.  The basic governing of -- the

15     assessment of the late fee is automatic, correct?

16         A.   Correct.

17         Q.   The -- the receiving the payment, how it's

18     applied is automatic?

19         A.   Yes.

20         Q.   You know, whether it's applied to principal,

21     interest, or a suspense account --

22         A.   Correct.

23         Q.   -- that's automatic?

24         A.   Correct.

25         Q.   The -- but if somebody calls after the late

68

```
 1        fee has been automatically assessed, there is some
 2        ability for an individual to waive it or not?
 3            A.   No, no.  Those two are two different.
 4            Q.   Okay.
 5            A.   I'm just saying -- I was referencing
 6        something completely different.
 7            Q.   Okay.
 8            A.   For a late fee, you can't call in and say,
 9        hey, can I get my late fee removed.  A late fee,
10        again, being mandated by the Deed of Trust, has --
11        cannot just get removed.  It can be requested and
12        we'll review it.  And someone can go back -- our
13        payment research team can go back and remove those
14        late fees.
15            The $10 charge is not really -- it's not
16        associated with any of the late fees.  I was just
17        making an example to clarify what we were talking
18        about.
19            Q.   Okay.  Well, what we were kind of talking
20        about before is -- is kind of what's -- what happens
21        automatically and what doesn't --
22            A.   Okay.
23            Q.   -- and you used the example of QWR that's
24        going to receive an individualized inquiry?
25            A.   Right.
```

69

1      Q.   And it sounds like if a customer calls in

2   with a request for Seterus to do something, that's

3   going to receive an individualized inquiry?

4      A.   It can.

5      Q.   Okay.  What else would have an

6   individualized inquiry versus automatic?

7      A.   When a loan is in litigation.

8      Q.   Okay.  What about property inspection fees,

9   is that automatic?

10      A.   They follow -- property inspection fees

11   follow the guidelines, the Fannie Mae guidelines.

12      Q.   Okay.  In the same way that the Fannie Mae

13   guidelines are plugged into MSP and it is -- it's

14   automatic?

15      A.   Correct.

16      Q.   If a loan is in default for X number of days

17   and the Fannie Mae guidelines say do a property

18   inspection fee at that point, that's -- somebody

19   gets called and it happens?

20      A.   Yes.

21      Q.   Okay.  Are the -- the letters that are sent

22   out on behalf of Seterus, is that automatic?

23              MR. MINOR:  Object to the form.

24      A.   Automatic in that they reflect the loan

25   status of the loan.

1      Q.   Yeah.  It's plugged into MSP that if a

2      customer has certain criteria, they get letter X

3      automatically?

4      A.   Yes.

5      Q.   Okay.  No one is saying, hey, let's send

6      letter X, it's automatic?

7      A.   Someone is saying that, someone has inputted

8      that information into the system for it to be

9      generated.

10     Q.   So not on an individualized basis, but as

11     far as North Carolina, certain parameters are put

12     into place in the software such that if a customer

13     reaches a certain situation a certain letter gets

14     sent --

15     A.   That's correct.

16     Q.   -- automatically?

17     A.   Correct.

18     Q.   Okay.  What about phone calls, is that

19     similar in that phone calls are made automatically

20     when a customer reaches a certain situation?

21     A.   No.  Because once we -- it depends on if

22     we're able to reach a customer or not.  If we're

23     able to reach a customer and have -- and -- and

24     resolve the matter that we're calling about, then

25     it -- it doesn't require -- it kind of -- it

1    depends -- then it requires someone that assesses if

2    another call needs to be made or not.

3        Q.    Okay.  Well, the -- an individual assesses

4    whether or not subsequent phone calls are necessary

5    after initial phone calls are made?

6        A.    After reaching a customer and speaking to

7    them if -- if -- if we're able to resolve the reason

8    why we're calling within that phone call.

9        Q.    Okay.

10       A.    In the same sense of the letters

11   essentially.  If -- if a customer resolves the --

12   the main subject of the letter, then it doesn't

13   require another letter being sent out.

14       Q.    Sure.  Is it -- is it fair to say then that

15   the initial call that seeks to reach the customer in

16   order to attempt to reach a resolution, that's

17   automatic?

18       A.    I guess I need more information about what

19   you mean about "automatic."

20       Q.    Well, in the same way we've been talking

21   about.  Meaning in North Carolina, if a customer

22   gets a certain -- parameters on their account, in

23   the same way they get a letter automatically, would

24   they get a phone call automatically?

25       A.    Someone would have to review it.

1          Q.    Before even the first phone call is made?

2          A.    Yeah.

3          Q.    Okay.  But not the letters?

4          A.    The letters, too.  I mean, you have to

5     review the content of the letter to make sure that

6     it's appropriate.  Automatic in the sense of that

7     it's the general -- general outline that's sent out.

8     But the -- the contents of the letter isn't

9     automatic.  The information is specific to the loan.

10    It's not a -- I -- I wouldn't be able to send a

11    general automatic letter to each customer.  It would

12    be very specific to the -- to the Hagers, for

13    example.

14         Q.    Well, and I'm not talking about a letter in

15    response to a QWR.

16         A.    Right.  I'm talking about general letters.

17         Q.    Okay.  So the -- we talked about the NC

18    Final letter, how that's -- how that's a name of a

19    letter that might go out, okay.  There's different

20    templates that are received -- that are sent out

21    based upon certain circumstances in their loan

22    payment history, correct?

23         A.    And but specific to their loan.  So the

24    contexts of -- even if it's an NC Final, the idea

25    might be the same for all the customers in North

73

1      Carolina, but the content of that letter is specific

2      to the Hagers' loan.  So a letter that's being sent

3      out is -- the content is specific to the Hagers'

4      loan.

5          Q.   In what way?

6          A.   So each subsequent letter -- in that the --

7      the date that the letter is sent out.  It might

8      not -- all the letters in North Carolina are not all

9      sent out on a specific date.  The total amount due

10     is not the same for all customers in North Carolina.

11     It's specific to the Hagers' loan.  Then the date

12     that the -- the expiration date of when the amount

13     is due is specific to the dates associated with the

14     Hagers' loan.  It -- it all coincides with their

15     specific loan and the payments that they last made.

16          All those dates are automatic in that they

17     are, for example, an NC Final demand is sent 45 days

18     after the last payment is received.  But the 45-day

19     term could happen -- is -- is generated and sent out

20     specific to the last time that the Hagers made a

21     payment.  So that's what I mean by automatic.

22          Q.   Okay.  Yeah.  So the -- the computer fills

23     in the date based upon the date that the letter goes

24     out, right?

25          A.   Say that again.

74

```
 1          Q.   Well, I think the examples you just gave are
 2     date, expiration date to make a payment, the amount.
 3     Those all differ based --
 4          A.   When it's -- when it's sent out, is that --
 5          Q.   Yeah.
 6          A.   Okay.
 7          Q.   Those all differ based upon the individual
 8     characteristics of the loan?
 9          A.   Correct.
10          Q.   But the other text is a template?
11          A.   That is derived from the Deed of Trust and
12     the Note and the servicing guideline, yes.
13          Q.   Oh, yeah.  I mean, but it is a template?
14          A.   It's reviewed -- it's reviewed by somebody
15     before it's sent out.
16          Q.   Every letter that goes out from Seterus is
17     reviewed by somebody before it goes out?
18          A.   I mean it's reviewed by that department that
19     sends it out, but yeah.
20          Q.   Okay.  Every letter?
21          A.   Again, I'm -- I'm making the representation
22     that it is reviewed.  I -- that the letters are
23     reviewed.  We have copies of each specific letter
24     that we send out.  I can review each specific
25     document.
```

75

1   Q. Right.  But it's generated based upon a

2 particular status.  We talked about NC Final,

3 45 days after the last payment is received an NC

4 Final is going to go out, right?  Is that --

5   A. 45 days after, yes, correct.

6   Q. And it will be individualized for the

7 borrower in that the date that the letter actually

8 goes out will be individualized, right?

9   A. Correct.

10   Q. And the expiration date of when they'll have

11 to pay will be individualized?

12   A. Correct.

13   Q. And the amount will have to be

14 individualized?

15   A. Right.  And the cost --

16   Q. And how it has to be paid?

17   A. Correct.

18   Q. And then their name will have to be

19 individualized?

20   A. Correct.

21   Q. And their address?

22   A. Uh-huh.

23   Q. And that's it?

24   A. And that's in the content of the letter

25 that -- that is describing the total amount due.

1          Q.   How is that individualized?

2          A.   It's part of the letter.

3          Q.   Okay.  So the text in an NC Final differs

4     from person to person?

5          A.   I mean, I don't know that it differs.

6          Q.   Okay.

7               MR. MAGINNIS:  We've been going about

8     an hour.  Why don't we take a quick break.

9               MR. EDWARDS:  Off at 11:21.

10          (Recess taken from 11:21 to 11:31.)

11               MR. EDWARDS:  On at 11:31.

12     BY MR. MAGINNIS:

13          Q.   Ms. Jacob, before the break, we were -- we

14     were kind of talking about some items.  And I did

15     have some kind of catch-up questions before we move

16     on to a new topic.

17               You talked about when you reviewed the

18     number of loans nationally in 2015, it was about

19     500,000 or upwards of 500,000 loans that Seterus

20     services; is that accurate?

21          A.   Yes, around there.

22          Q.   Do you have any understanding of how many of

23     those are in North Carolina?

24          A.   I don't.

25          Q.   Is Seterus in all 50 states?

1        A.   We are.

2        Q.   Is -- are there particular -- other than,

3    you know, the bigger states have more loans, is

4    there any state that's a focus or an area that's a

5    focus for Seterus' business?

6        A.   No.  There's not one specific state, no.

7        Q.   Okay.  We were talking about the data points

8    that are reviewed by Seterus for completeness, I

9    think was your phrasing; is that fair?

10       A.   Yes.

11       Q.   When -- if a loan is deemed to be

12   incomplete, is that -- what happens?

13       A.   We will send the prior servicer our

14   checklist of items that they need to fill in.  So

15   whatever items are incomplete, we'll tell them, hey,

16   we can't start servicing this loan.  Although it's

17   on the radar, we can't start servicing it.  We need

18   these items rectified before we start can servicing

19   it.

20       Q.   Okay.  And that's as to one loan as opposed

21   to the -- you don't avoid servicing the entire pool

22   while --

23       A.   Correct.

24       Q.   -- you get things completed on one loan?

25       A.   Right.  Correct.

```
 1        Q.   Okay.  So you would -- after you've done the
 2     audits of all of the loans in a particular pool,
 3     you'll start on the ones that are complete and
 4     you'll get additional information on the ones that
 5     are incomplete?
 6        A.   You know, I -- I can't speak specifically if
 7     it affects the pool or not, actually, so I wouldn't
 8     know.
 9        Q.   Okay.  Well, we'll --
10        A.   It might halt the entire transfer.  I don't
11     know.
12        Q.   It might or it might not?
13        A.   Yeah.
14        Q.   Okay.  But once the information is received
15     to complete the information, then you guys go ahead
16     and start servicing?
17        A.   Correct.  Once we verify that there's
18     nothing -- there's nothing -- there are no -- all
19     the issues are rectified or that the loan in and of
20     itself are fine, then we start servicing.
21        Q.   Okay.  And -- and going back the data points
22     that are reviewed, the primary, secondary, tertiary
23     audits, I just wanted to clarify.
24             The -- the servicer, Seterus, does not
25     physically receive the Note and the Deed of Trust
```

1       before they take over servicing, correct?

2           A.   We will receive -- when we start servicing,

3       we do.

4           Q.   Prior to starting the servicing, you don't

5       physically receive the Note and the Deed of Trust?

6           A.   Right.   The prior servicer who was servicing

7       it will have it.

8           Q.   Okay.   And the -- the data points are going

9       to include name and identifying information and

10      information about the loan history?

11          A.   That's correct.

12          Q.   And they'll say what state it's in

13      presumably?

14          A.   Correct.   Uh-huh.

15          Q.   Will they -- will it note what -- any

16      identifying characteristics about the Note and Deed

17      of Trust other than information relating to the --

18      the loan history?

19          A.   And the state specific.   That's -- that's

20      the extent of my knowledge.

21          Q.   Because there's a uniform -- there's a

22      uniform North Carolina Fannie Mae loan?

23          A.   Correct.

24          Q.   And so do you get information about whether

25      or not those are all conforming uniform North

1    Carolina Fannie Mae loans as a data point?

2        A.   I don't know that I can speak to that.

3        Q.   Okay.  Are there -- does Seterus perform

4    routine audits or quality control on loans during

5    the servicing process?

6        A.   We do.

7        Q.   Okay.  Is that based upon a customer inquiry

8    or are there loans for which the customer has said

9    nothing which are audited in some way or fashion?

10        A.   In both circumstances.

11        Q.   Okay.  Tell me about the process associated

12    with audits and quality controls when there has been

13    no customer inquiry.

14        A.   For example, if a loan qualifies for a -- or

15    has certain outliers that qualify them for a

16    modification, we can send out a streamline.  It's

17    what we call streamline modification where, although

18    we -- you know, we'll send a streamline trial to a

19    customer and say, hey, would you be interested in

20    catching up the arrears to your loan to the back end

21    of the loan, and this is what it looks like, and we

22    would give them that.  So those type of audits are

23    done even if the customer is not contacting us.

24        Q.   And when you say -- to give that -- to use

25    that example, is that something that an individual

1        is randomly pulling up individual loan information

2        to see if they might qualify or is that

3        automatically generated?

4            A.    An individual is looking at the loan to see

5        if it qualifies for a streamline -- streamline mod.

6            Q.    What's the process for determining which

7        loans they're going to look at?

8            A.    There are outliers that loss mitigation team

9        identifies.  There are -- you know, whether it's the

10       date of default or the number of months delinquent,

11       the total loan amount.  If they've had any prior

12       modifications; if they've had a HAMP mod, et cetera.

13           Q.    Okay.  So in -- if certain criteria are met,

14       a kind of list is generated for the loss mitigation

15       team to review to see if they might want to send out

16       something to them regarding modification?

17           A.    Correct.

18           Q.    Okay.  Are -- are there any audits or

19       quality controls done that are just, hey, we haven't

20       looked at Joe Smith's loan in a while, let's look at

21       Joe Smith's loan?  Is there anything like that?

22           A.    I guess you would have to give me a more

23       specific example.

24           Q.    Well, the example you gave is kind of

25       criteria are generated by the MSP system and a list

1      is generated as to whether or not we want to, you

2      know, approach them for a loan modification, right?

3          A.   On -- on -- and the example was that the

4      customer hasn't been in contact with us.

5          Q.   Right.  So in talking about audits and --

6      and quality control, are -- are there any audits or

7      quality controls to ensure that Seterus is following

8      its procedures as opposed to generating things for a

9      promotional offer?

10                  MR. MINOR:  Object to the form.

11         A.   We routinely conduct audits on our loans

12     to -- for accuracy.

13         Q.   Okay.

14         A.   If there -- if there is -- to maintain and

15     make sure that there is -- if there are errors that

16     identified that they're rectified.

17         Q.   Tell me about that.

18         A.   I mean outside that we routinely conduct

19     audits to make sure that, you know, we're in check

20     and balances to have good accounts.  That's really

21     what an audit is.  That's what we conduct.

22         Q.   Okay.  So what is it that you audit?

23         A.   The loan file.

24         Q.   So you routinely will look at an

25     individual's loan file to -- to look for what?

83

1        A.    All aspects of servicing, whether, you know,

2   the letters were sent out on time; whether payments

3   were assessed accurately; whether, you know, contact

4   made with -- contact made or contact not made with

5   the customer was within the state guidelines.

6        Q.    Okay.  Is there an audit department who --

7   who conducts those audits?

8        A.    We do.  We have one.

9        Q.    Okay.  Is that what it's called, the audit

10  department?

11       A.    No.

12       Q.    What is it called?

13       A.    I believe it's quality control.

14       Q.    Okay.  So the quality control department

15  is -- is the -- the loan modification example that

16  you gave earlier and talked about audits and quality

17  control, would that be in the quality control

18  department as well?

19       A.    Outside of knowing what their general

20  functions are, I mean it could stem from that.  I

21  wouldn't be able to say.

22       Q.    Okay.  What sorts of audits does the quality

23  control department do?

24       A.    The ones I just mentioned.

25       Q.    Any others?

84

```
 1        A.   To my knowledge, there's the ones that I
 2    mentioned.  I'm sure there are others that I don't
 3    know about.
 4        Q.   Do you know where the quality control
 5    department is based?
 6        A.   What do you mean?
 7        Q.   Are there people who work in the quality
 8    control department in one of Seterus' offices?
 9        A.   Yeah.
10        Q.   What offices?
11        A.   I'm sure in both.
12        Q.   Okay.  When you say "both," which ones are
13    you referring to?
14        A.   We have a Beaverton office and an RTP
15    office.
16        Q.   Okay.  Are those the primary locations where
17    individuals who are working for Seterus work?
18        A.   Yes.
19        Q.   Okay.  So -- and there's a billing
20    department in Los Angeles?
21        A.   I don't know much about that at all.
22        Q.   Okay.  So you don't know what workers, if
23    any, work out of the California or LA office?
24        A.   We don't have a California or LA office.
25        Q.   Okay.  Does Seterus do their own work
```

85

1      regarding receiving bill payments or do they

2      contract that out?

3          A.   We have lockbox locations where customers

4      can send a payment and it is received and sent to

5      Seterus for review.

6          Q.   Okay.  Where are those?

7          A.   I don't know all of them.

8          Q.   Are there -- is there more than one?

9          A.   I believe so.

10         Q.   Okay.  Do you know about how many there are?

11         A.   I don't.

12         Q.   Are there more than five?

13         A.   Again, I don't know --

14         Q.   Okay.

15         A.   -- how many there are.

16         Q.   But it's more than one?

17         A.   Yeah.

18         Q.   And then the quality control department,

19     there might be people in Beaverton and there might

20     be people in RTP?

21         A.   Correct.

22         Q.   And you work out of the RTP office?

23         A.   I do.

24         Q.   Do you know anyone in the quality control

25     department at RTP?

86

1          A.   I have access to them if I need to find

2      them, but I don't know them personally.

3          Q.   You don't know anyone's name?

4          A.   No.

5          Q.   You don't know who is in charge of the

6      quality control department?

7          A.   I don't.

8          Q.   Okay.  Let's talk about the Note and Deed of

9      Trust.

10              Let's mark this as 3.

11          (PLAINTIFFS' EXHIBIT NUMBER 3 WAS MARKED.)

12          A.   Thanks.

13                   MR. MINOR:  Thank you.

14          Q.   Have you seen Exhibit 3 before?

15          A.   This is a copy.  I have seen it before.

16          Q.   What is Exhibit 3?

17          A.   This is a copy of the Note.

18          Q.   Okay.  I'm showing you Exhibit 4.

19          (PLAINTIFFS' EXHIBIT NUMBER 4 WAS MARKED.)

20                   MR. MINOR:  Thank you.

21          Q.   Have you seen Exhibit 4 before?

22          A.   Yes.  This is a copy of the Deed of Trust.

23          Q.   Okay.  And did you review these in

24      preparation for this deposition?

25          A.   I did.

1        Q.   Okay.  And these are the operative -- these

2    are copies of the documents, which we've been

3    talking earlier about as the Note and the Deed of

4    Trust that the Hagers have from their loan?

5        A.   That's correct.

6        Q.   Okay.  And these documents were -- were

7    generated in 2006?

8        A.   Correct.

9        Q.   And to your knowledge, there's not been any

10   amendments or modifications since 2006 that would

11   change the rights and obligations of the parties to

12   these contracts?

13       A.   That's correct.

14       Q.   Okay.  The Hagers have to follow this

15   contract?

16       A.   They do.

17       Q.   You all as the mortgage servicer have to

18   follow this contract?

19       A.   That's correct.

20       Q.   Okay.  As well as the Fannie Mae servicing

21   guidelines?

22       A.   Correct.

23       Q.   What happens if the servicing guidelines in

24   these contracts conflict?  What does Seterus do?

25       A.   I don't know of a circumstance where it has.

88

1     Do you have an example?

2         Q.   Are you aware of any circumstances where

3     they might conflict?

4         A.   I'm not aware.

5         Q.   Okay.  And if you look at the bottom of

6     Exhibit 4, and that's the Deed of Trust, do you --

7     it's on all of the pages, but let's just look at

8     page 1.  Do you see at the bottom of the page where

9     it says "North Carolina - Single Family - Fannie

10    Mae/Freddie Mac UNIFORM INSTRUMENT"?

11        A.   I do.

12        Q.   Is that what we were talking about earlier

13    where each state has a uniform document for

14    compliance with Fannie or Freddie?

15        A.   That's correct.

16        Q.   So this -- this title indicates to you that

17    this is one of these documents that everything in

18    North Carolina is going to be identical?

19        A.   That's correct.

20        Q.   Okay.  And the only things that would not be

21    identical are the -- the names, the address, the

22    rate, the loan amount, and things like that?

23        A.   The term, correct.

24        Q.   The -- I'll call them covenants, but the

25    legalese is going to be same in all of them?

89

```
 1        A.    Correct.

 2        Q.    Okay.  Okay.  Let's put these to the side.

 3   We'll probably have to come back to them.

 4              Let me show you a document.  We'll mark this

 5   big boy as 5.

 6        (PLAINTIFFS' EXHIBIT NUMBER 5 WAS MARKED.)

 7                   MR. MINOR:   Thank you.

 8        Q.    Have you seen Exhibit 5 before?

 9        A.    Yeah.

10        Q.    What's Exhibit 5?

11        A.    This is a partial payment history.

12        Q.    When you say "partial payment history," why

13   do you say that?

14        A.    It goes through October 7, 2015.

15        Q.    Okay.  Okay.  So it's a partial payment

16   history in that it doesn't cover October 8, 2015, to

17   today?

18        A.    That's correct.

19        Q.    But it would be a payment history for those

20   dates that are on the first page?

21        A.    Correct.  And I didn't see the Seterus

22   initial -- when we started servicing the history

23   that's associated with it.

24        Q.    Okay.  Yeah.  And if you could, turn to the

25   last page of Exhibit 5.
```

```
 1        A.   This is page 122 of 142.

 2        Q.   Yeah.  And I'll represent to you that we did

 3   not receive page 123 going forward.  Any idea why?

 4   Any idea what might be in there?

 5        A.   Seterus started servicing the loan

 6   October 1, 2012.

 7        Q.   Okay.  So it might be because the loan

 8   activity is 1/1/10.  Pages 123 through 142 might

 9   include the servicing history from before Seterus

10   took over?

11        A.   That's correct.

12        Q.   Okay.  That would be what is in there?

13        A.   Correct.

14        Q.   There's nothing else in there?

15        A.   I don't know.

16        Q.   Okay.  As far as you know?

17        A.   I mean, I haven't taken -- taken a look at

18   it, so I wouldn't even know.

19        Q.   But as you -- as you pointed out, page 122

20   includes -- in chronological order, it starts from

21   the date that Seterus is supplying servicing rights

22   to the loan?

23        A.   Correct.  It says "Loan Acquisition Date."

24        Q.   And so it's your understanding that the

25   subsequent pages are just the previous loan history
```

```
 1      that goes back through January 1, 2010?

 2           A.   Again, I -- I don't -- I don't even know

 3      what it could hold.

 4           Q.   Okay.  You don't know one way or the other?

 5           A.   Right.  I wouldn't know.

 6           Q.   Okay.  Is this a document that's generated

 7      in the ordinary course of business for an individual

 8      borrower?

 9           A.   It is.

10           Q.   Okay.  Is this generated within the context

11      of litigation or -- or is this just something that's

12      accessible for any borrower?

13           A.   I believe this was generated in this format

14      specific to litigation.

15           Q.   Okay.  Is this -- is this an MSP printout?

16           A.   It is.

17           Q.   This comes from MSP?

18           A.   This does.

19           Q.   So you can print out loan activity in MSP

20      and it will give you something that looks like this?

21           A.   That's correct.

22           Q.   Okay.  And this contains -- it appears to

23      me, feel free to review it, but it appears to me to

24      contain a list of communications made by Seterus to

25      the Hagers over the course of the history of their
```

1      servicing the loan?

2          A.   That's correct.

3          Q.   Okay.  It does not contain -- it's not a

4      payment history, right?

5          A.   I believe it's all activity.

6          Q.   Okay.  And -- and some of these have kind of

7      nomenclature associated with them and I want to ask

8      you about what some of those terms are.  But if you

9      could leaf through initially and point me to a

10     record that would indicate that a payment has been

11     made and received.

12         A.   On page 120 of 142.

13         Q.   Okay.

14         A.   The fourth item from the bottom.  So

15     12/21/2012 it says "Western Union Speedpay."

16         Q.   Okay.

17         A.   And so in association with the speedpay that

18     was taken out, that note was put into this history.

19         Q.   Okay.  So it -- it contains -- and so if

20     something says "TP316 - Western Union Speedpay,"

21     that's going to be indicative of a payment through

22     Western Union?

23         A.   Correct.

24         Q.   Does this contain all payments or just some

25     types of payments?

93

1         A.    A loan transaction history would outline the

2     specific loan payments and the amounts and the

3     transactions associated with it.  So this is part of

4     that entire history.

5         Q.    Okay.  Is it fair to say that what this

6     is -- but that it does contain -- is that it

7     contains all outward communications by Seterus to

8     the borrower?

9         A.    It does contain that.

10        Q.    Okay.  There wouldn't be any communications

11    that are not in here?

12        A.    There should not be.

13        Q.    Okay.  I'll mark this as 6.

14        (PLAINTIFFS' EXHIBIT NUMBER 6 WAS MARKED.)

15        Q.    Have you seen Exhibit 6 before?

16        A.    I haven't.

17        Q.    Okay.  I'll represent to you that Exhibit 6

18    was produced to us in discovery and it is from your

19    counsel and it's intended to be kind of a translator

20    for what these codes that are listed in the Loan

21    Activity refer to.

22        A.    Okay.

23        Q.    Does that appear -- does that appear to be

24    accurate?

25        A.    Again, it's not a Seterus document.  If it's

94

1      provided to you by my attorney, then I that's what

2      that is.

3          Q.   Well, why don't you look at it and see if

4      any of the codes associated with it do not appear to

5      be correct.

6          A.   They -- they seem to be correct.  But I --

7      I -- yeah.  I'm just going to say that.

8          Q.   Okay.  Is there any one of these particular

9      bullet points that raises some questions that that

10     might not be what this code refers to?

11         A.   No.

12         Q.   Okay.  And this might be a little

13     attenuated, but this is the best way I could figure

14     out to decode this thing.

15         A.   Okay.

16         Q.   I'm going to show you some examples of

17     documents that we've received in discovery and then

18     we're going to find them in this ledger.

19         A.   Okay.

20         Q.   And I want to confirm with you that this

21     letter matches the code.

22         A.   Okay.

23         Q.   Does that make sense?

24         A.   All right.

25         Q.   And it's a little cumbersome and I'm sorry

1    for that.

2             All right.  So let's mark this as 7.

3         (PLAINTIFFS' EXHIBIT NUMBER 7 WAS MARKED.)

4         Q.   Have you seen Exhibit 7 before?

5         A.   I have.

6         Q.   What is Exhibit 7?

7         A.   It is a notice to the customers advising

8    them of the payment that was due on December 1,

9    2013, and the late charge assessed due to not

10   receiving the payment.

11        Q.   Okay.  And if you want to keep the big loan

12   activity kind of off to the side.

13        A.   Okay.

14        Q.   Do you see the Bates numbers at the bottom

15   right-hand corner of that document?

16        A.   Of this one, right?

17        Q.   Of the big document.

18        A.   Yep.

19        Q.   Okay.  If you could turn to Bates Number

20   3136.  Let me know when you're there.

21        A.   All right.

22        Q.   Okay.  And it appears to me that the loan

23   activity big document the dates are -- are generally

24   a day or two off from the dates on the

25   correspondence.  Any idea why that might be?

96

1          A.   MSP is not in realtime.

2          Q.   Okay.  So if you look at the one from

3     December 19, 2013, DQ111, do you see that?

4          A.   I do.

5          Q.   And it calls it a "Late Notice."

6          A.   Uh-huh.

7          Q.   Is that referring to this document that's

8     been marked as Exhibit 7?

9          A.   Again, because MSP is not in realtime, I

10    could verify it with the department, but to the best

11    of my knowledge, as I read it, it seems to me as it

12    does, but I couldn't confirm.

13         Q.   Okay.  And you've seen the form before

14    that's Exhibit 7?

15         A.   I have, yeah.

16         Q.   Okay.  Is it your understanding that that is

17    coded in the Loan Activity as a late notice?

18         A.   It is.

19         Q.   Okay.  And so any form in this Loan Activity

20    that refers to a late notice would be something like

21    this form?

22         A.   It should be similar.

23         Q.   Except the date would be different?

24         A.   The date, the amount, the late fee, and then

25    the remediation options.

97

1        Q.   When you say "remediation options," what are
2    you referring to?
3        A.   Well, this one references to lower your
4    interest rate and reduce your payment.
5        Q.   Okay.  So this -- that might differ?
6        A.   It could.
7        Q.   Okay.  So a late notice would differ based
8    upon the date, the name?
9        A.   Just the loan file.  It just depends case by
10   case.
11       Q.   Well, I'm just asking what would be
12   different in -- in a late notice?
13       A.   For a customer, say for example, who has had
14   a HAMP modification and has had, you know, two or
15   three other modifications, a lower interest rate
16   might not be something that they could qualify for.
17   They might have already had a couple of
18   modifications.  They might already be at a lower --
19   the lowest payment, for example.  Just an example to
20   this letter, so...
21       Q.   Well, and I understand that a different
22   customer might not be eligible or might receive a
23   different letter, but this is -- this is what's
24   referred to in the Loan Activity as a late notice --
25       A.   Correct.

98

1       Q.   -- correct?  Okay.

2            And this form is a late notice?

3       A.   That's correct.

4       Q.   And any -- any time a late notice was

5       mailed, it would look like this?

6       A.   It would be similar to this.

7       Q.   Okay.  And it would be different -- based

8       upon your testimony is that it would be different

9       for the Hagers, it would be different based on the

10      amount due --

11      A.   Uh-huh.

12      Q.   -- and when it was due?  Is that a yes?

13      A.   Yes.  Yes.

14      Q.   You've done very well with that actually.

15      A.   Yes.

16      Q.   The late charge, the amount of the late

17      charge?

18      A.   Yes.

19      Q.   Okay.  And it's your testimony that these

20      two bullet points can vary?

21      A.   The remediation.  Or what's offered in the

22      letter, the contents of the letter can vary.

23      Q.   What?  What specifically in the letter

24      varies?  Is it the two bullet points or is it

25      something else?

99

1       A.   Again, I -- I couldn't speak to all the

2    letters.  It just -- like I said, it varies case by

3    case.

4            In this specific, a late notice, Seterus is

5    advising the Hagers if it's a financial hardship due

6    to the reason that they're unable to pay, we can

7    offer programs that may be able to reduce their

8    payment or lower their interest rate.

9       Q.   Okay.  Looking back at this DQ111 --

10      A.   Correct.

11      Q.   -- that is a -- a name of a -- of a form

12   letter, correct?

13      A.   Correct.

14      Q.   DQ111 Late Notice is the name of a form

15   letter?

16      A.   Okay.  Yeah.

17      Q.   That is sent in certain situations --

18      A.   Yes.

19      Q.   -- is that correct?

20      A.   That's correct.

21      Q.   Okay.  And it's your testimony that the

22   remediation options can change in the DQ111 Late

23   Notice or is it your testimony that you might get a

24   different sort of letter based upon your situation?

25      A.   That this is a late notice that is sent out

1    that identifies that specific month, but specific to

2    the Hagers' loan, so specific to their situation.

3        Q.   Okay.  And so I'm asking you what about

4    DQ111 Late Notice changes based upon a situation?  I

5    think plainly the date is going to change, right?

6        A.   Are you comparing this to another loan?

7        Q.   I'm comparing it to other DQ111 Late

8    Notices.  How are they going to differ?

9        A.   That the Hagers have received?

10       Q.   Yeah.  Sure.

11       A.   Yeah.  So the date would be different.  And

12   then the content of the letter would be in reference

13   to the Hagers' loan.

14            So they haven't had a prior mod, so we could

15   offer them a loan modification, for example, that

16   could reduce their payment or lower their interest

17   rate.

18       Q.   Okay.  So let me -- let me understand your

19   testimony, okay.  The Loan Activity indicates that a

20   DQ111 Late Notice was sent on or about December 19,

21   2013?

22       A.   It was inputted into the system that day,

23   yeah.

24       Q.   Okay.  And -- and to a reasonable degree of

25   confidence, we believe that this document that's

1      Exhibit 7 is the representation of that notice?

2          A.   That's correct.

3          Q.   Okay.  And we've -- we've talked about the

4      fact that these things are individualized in things

5      like amount, name, date, deadline?

6          A.   Correct.

7          Q.   Okay.  And now I want to be very, very clear

8      about what your testimony is.

9          A.   Okay.

10         Q.   Is your testimony that the DQ111 Late Notice

11     varies on the remediation options, meaning the

12     bullet points in Exhibit 7 can vary, but it still is

13     a DQ111 Late Notice, or is it your testimony that if

14     you have different options available to you, you'll

15     get a different form?

16         A.   In my understanding, those two items are the

17     same, so I'm not -- to the way that you're

18     representing it to me, it seems the same.

19         Q.   Okay.  The DQ111 Late Notice is a template

20     form that can be -- that is modified based upon the

21     recipient, correct?

22         A.   This is a late notice that we sent out to

23     this customer.

24         Q.   Okay.  And there are other late notices in

25     here, I'll represent to you.

102

1        A.   There are.

2        Q.   And there are other DQ111 Late Notices,

3   correct?

4        A.   There are.

5        Q.   Okay.  And there are other customers who get

6   DQ111 Late Notices?

7        A.   That's correct.

8        Q.   Okay.  How does a DQ111 Late Notice differ

9   between the Hagers and another customer, who also --

10   another North Carolina customer who also receives a

11   DQ111 Late Notice?  What is different?

12        A.   Specific to their loan, the options that

13   they qualify for can be different.

14        Q.   What aspects of this letter specifically are

15   different?

16        A.   The products that they qualify for.

17        Q.   Okay.  So how is that represented in the

18   letter?

19        A.   In this letter, it's stated as a reduction

20   in payment or a lower interest rate.

21        Q.   Okay.  So the bullet points?

22        A.   That's how it's written here.

23        Q.   Well, is that what's different?

24        A.   It could be.  I mean it just depends.  Those

25   are the options that are represented here in this

```
 1      letter.
 2          Q.   Well, let's -- and I promise I'm not trying
 3      to be difficult.  I just want to make sure that
 4      we're on the same page about what is different from
 5      letter to letter.
 6              Let's start at the top of Exhibit 7.  And
 7      I'm not trying to be rude.
 8              The logo that says "Seterus," that's going
 9      to be the same every time, right?
10          A.   It is a -- yes.  It's...
11          Q.   In the DQ111 notice, there's going to be a
12      Seterus logo that's that size and that color and
13      that shape every time?
14          A.   I mean, again, I'm -- I'm here to speak on
15      this specific loan and this specific letter.  So in
16      this letter, that's the logo, that's the print.  If
17      we tomorrow decided to change it, it might be
18      different.
19              But this letter that was sent December 17,
20      2013, this is a late notice.  This is the amount
21      that was due.  This is the late charge that we have
22      advised them that they have assessed.  This is to
23      who it is, to what address.  We advised them of
24      their grace period and we've advised them of what
25      their options are and the way to contact us.
```

104

1          Q.   Let me ask the question again.  In any DQ111

2     Late Notice form is the logo going to be the same?

3          A.   Unless we change it, no.

4          Q.   Okay.  Is the address going to be the same?

5          A.   Yes.  The customer's address will be

6     different.

7          Q.   Sorry.  I was just working down in

8     Exhibit 7.  Is Seterus' address going to change,

9     unless they move?

10         A.   Unless we move, no.

11         Q.   Okay.  The date will change?

12         A.   Uh-huh.  Yes.

13         Q.   The "Call now.  We're here to help you find

14    a solution," will that change?

15         A.   It shouldn't change.

16         Q.   Will the phone number change?

17         A.   No.

18         Q.   There's a redacted portion of the loan

19    number, that will change, right?

20         A.   It will.

21         Q.   "Serviced by Seterus, Inc.," that won't

22    change?

23         A.   It should not.

24         Q.   The name and address will change?

25         A.   Yes.

1        Q.    "Dear" will be the same, but the name will

2    be different?

3        A.    The name will be different.

4        Q.    Okay.  The first sentence, "Our goal is to

5    help you by offering real solutions," that's going

6    to be the same?

7        A.    Yes.

8        Q.    "We see that you are behind on your mortgage

9    payment," that's going to be the same.

10       A.    Again, essentially everything will be the

11   same except, like I said, the -- the total payment

12   amount, the late charge, and their options.

13       Q.    Okay.  And when you say the options, you're

14   talking about the two bullet points?

15       A.    Correct.

16       Q.    Everything else is the same?

17       A.    Could be the same.

18       Q.    Is the same?

19       A.    I'm not -- I don't have every letter in

20   front of me.  I couldn't speak to every letter.

21       Q.    Well, how --

22       A.    That's why I'm saying it could be the same.

23   I haven't reviewed every Seterus loan letter.

24            This specific letter, this is the -- this is

25   what it says.  And it gives them our current -- the

106

1       information that was current at the time that we

2       sent out the letter.

3           Q.    Okay.  But -- and I know you haven't

4       reviewed every loan letter, but I -- the form, the

5       DQ111 form, what is modifiable, depending on the

6       customer, is their contact information, the amount

7       due, the late fee, and the two bullet points?

8           A.    And the options that we assess to them, yes.

9           Q.    And when you say "options," you mean the two

10      bullet points?

11          A.    In this scenario, yes.

12          Q.    And everything else in this letter is the

13      same on every DQ111?

14          A.    I haven't reviewed every DQ111 letter.  I

15      can tell you in this scenario, this letter is

16      standard.

17          Q.    Do you think that you would have to review

18      every DQ111 letter to know if they're the same?

19          A.    If that's my testimony.  If you're asking me

20      if that's my testimony that all the letters are the

21      same, then I would have to review it.

22          Q.    Well, but the template is going to be the

23      same, right?

24          A.    Yes.

25          Q.    I mean someone didn't sit down at the

1       computer and draft this, it's automated -- it's

2       automated except for the specifics of the particular

3       loan, right?

4           A.   Yes.  The information contained in the loan

5       that we represented will essentially be the same.

6           Q.   Okay.  But what would vary, not to beat a

7       dead horse, is the date, the name, the amounts owed,

8       the late fee amount, and the remediation options?

9           A.   Correct.

10          Q.   Okay.  And every other reference in

11      Exhibit 5 to a DQ111 Late Notice is going to look

12      the same as that except for the differences that we

13      just talked about?

14          A.   It should.

15          Q.   All right.  I promise I'm not trying to be

16      difficult.

17              Okay.  All right.  So this is Exhibit 8.

18          (PLAINTIFFS' EXHIBIT NUMBER 8 WAS MARKED.)

19          Q.   Do you recognize Exhibit 8?

20          A.   I do.

21          Q.   Okay.  What is Exhibit 8?

22          A.   It is the Hagers' account statement --

23          Q.   Okay.

24          A.   -- for October 16, 2012.

25          Q.   And if you turn to, in the big document,

1       Bates page 3157.  Are you there?

2           A.   I am.

3           Q.   Okay.  If you look at the third item from

4       the bottom, the "OP718 - Account Statement" --

5           A.   Yes.

6           Q.   Okay -- is that reference, 10/16/12 OOP718

7       Account Statement, the memorialization of the

8       sending of this statement?

9           A.   It should be.

10          Q.   Okay.  Kind of similar questions to what we

11      just talked about.

12               If in this ledger it says "OP718 - Account

13      Statement," it's going to be something -- the form

14      is going to be very, very similar to Exhibit 8?

15          A.   It should be, yes.

16          Q.   Okay.  What will differ?

17          A.   The customer's contact information; the

18      address; their names; when -- the date when the

19      statement was generated; the loan number; their

20      interest rate; their payment breakdown; the

21      year-to-date interest paid; year-to-date late

22      charges; year-to-date taxes; year-to-date principal;

23      their escrow arrears; their interest arrears; escrow

24      balance; principal balance; prepayment fee; next

25      rate change date.  And then their activity since

```
1    their last statement would change as well.

2        Q.   Let me stop you on the -- the prepayment fee

3    and the next rate change date would vary based upon

4    the individual customer?

5        A.   And it says -- there's a note in there that

6    says Seterus does not currently charge a prepayment

7    fee.

8        Q.   Okay.  So would that probably be the same?

9        A.   At that time, it would have been the same

10   for those letters going out.

11       Q.   Okay.  And these documents, it looks like

12   the contact information and the numbers and the

13   dates are going to be different.

14       A.   For -- for Seterus or for the Hagers?

15       Q.   For anyone, in OP718 the numbers are going

16   to be different for everybody and the address is

17   going to be different for everybody?

18       A.   Yeah.

19       Q.   Okay.  And MSP generates those numbers?

20       A.   The -- the transaction history would

21   generate those numbers.

22       Q.   Okay.  And the account statement goes out

23   every month?

24       A.   Yes.

25       Q.   Automatically?
```

```
1        A.   Yes.

2        Q.   Okay.  And MSP will populate those fields

3   that you talked about that are going to differ from

4   customer to customer and date to date?

5        A.   The transaction history will, yeah.

6        Q.   Okay.  The transaction history will populate

7   that, correct?

8        A.   Correct.

9        Q.   And everything else will be the same?

10        A.   Yeah.

11        Q.   Okay.  And every OP718 Account Statement in

12   this Loan Activity file will -- other than the

13   differences populated by the transaction history,

14   will look the same as this?

15        A.   It should be the same.

16        Q.   Okay.  All right.  Mark this one as 9.

17        (PLAINTIFFS' EXHIBIT NUMBER 9 WAS MARKED.)

18        Q.   Okay.  Have you seen Exhibit 9 before?

19        A.   Yes, I have.

20        Q.   What is Exhibit 9?

21        A.   It is a correspondence to the Hagers

22   advising them of the payment that was placed in

23   suspense because the funds were insufficient to

24   satisfy a full contractual payment due.

25        Q.   Okay.  If you could turn in the big document
```

1      to Bates 3086.

2          A.   Okay.

3          Q.   Are you there?

4          A.   Uh-huh.

5          Q.   Okay.  Similar questions.  If you look two

6      entries down at 2/18/15 TP353 Notice of Noncredit.

7          A.   Yes.  I see it.

8          Q.   Is that the memorialization of the sending

9      of this form?

10         A.   It should be, yes.

11         Q.   This is a TP353 Notice of Noncredit letter?

12         A.   That's correct.

13         Q.   And so every reference in this Loan Activity

14     to a TP353 Notice of Noncredit letter is going to

15     have a document the format looking similar to this?

16         A.   That's correct.

17         Q.   Okay.  And what would differ would be what?

18         A.   The customer's name, address, date, loan

19     number, and -- would differ.

20         Q.   Everything else would be the same?

21         A.   Essentially.

22         Q.   Okay.  Let's do Exhibit 10.

23          (PLAINTIFFS' EXHIBIT NUMBER 10 WAS MARKED.)

24         A.   Thanks.

25         Q.   You're welcome.

112

1          Okay.  Have you seen Exhibit 10 before?

2      A.   I have.

3      Q.   What is Exhibit 10?

4      A.   It is a correspondence that we sent out to

5      the Hagers on March 24, 2013, advising them about

6      the funds that we have placed -- that we have held

7      until we are able to receive the remaining funds to

8      satisfy their March payment.

9      Q.   Okay.  And if you could turn in the big

10     document to 3150 Bates.  Are you there?

11     A.   Yes.

12     Q.   That was quick.

13          Okay.  If you look two entries from the

14     bottom, March 25, 2013, DQ759 Partial Payment

15     letter.

16     A.   Yes.

17     Q.   Is that the memorialization for the sending

18     of Exhibit 10?

19     A.   Yes.

20     Q.   And so any reference to a partial payment

21     letter DQ759 in this Loan Activity file will refer

22     to the sending of a letter similar to this?

23     A.   Yes.

24     Q.   To Exhibit 10?

25     A.   Yes.

113

```
1          Q.   And -- except there will some discrepancies
2     based upon the individual circumstances?
3          A.   That's correct.
4          Q.   What would be those in this letter?
5          A.   The amount of funds being held; the date
6     that it satisfies the loan payment; the customer's
7     name; obviously their address; the date of the
8     letter; the loan number; and also the charges that
9     are subject applicable to the state law.  Those are
10    outlined.
11         Q.   So the charges down in the last three
12    columns, they're going to vary based upon North
13    Carolina -- if there is a law about that in North
14    Carolina?
15         A.   That's correct.
16         Q.   And everything else will stay the same?
17         A.   It should stay the same.
18         Q.   Okay.  This is 11.
19        (PLAINTIFFS' EXHIBIT NUMBER 11 WAS MARKED.)
20         Q.   Have you seen Exhibit 11 before?
21         A.   I have.
22         Q.   What's Exhibit 11?
23         A.   It is the North Carolina Final Demand.
24         Q.   We've been referencing an NC final
25    previously.  Is that what this is?
```

```
 1        A.   It is.

 2        Q.   Okay.  And if you turn to 3157 in the big

 3   document, which is the last page.

 4        A.   All right.

 5        Q.   And right in the middle of it, there's a

 6   reference to 10/18/12 DM724 North Carolina Final.

 7        A.   Yes.

 8        Q.   Okay.  And is that the memorialization of

 9   the sending of Exhibit 11?

10        A.   It is.

11        Q.   And anywhere in this big Loan Activity file

12   that references DM724 or North Carolina Final, it

13   will be a document that looks like this?

14        A.   Similar to this.

15        Q.   And it will differ based upon certain

16   characteristics of the status of the loan?

17        A.   Correct.

18        Q.   And what would those be in this letter?

19        A.   The date that the letter generated; the

20   address; the specific name of the customer can vary,

21   even on the same loan; the loan number; the total

22   amount due; the date for -- expiration date; and

23   then how many days.  So the end of the second

24   paragraph which:

25             "Any such action will not take place before
```

1      45 days from the date of this notice."

2          Q.   And everything else would be the same?

3          A.   Should be the same.

4          Q.   And you get --

5          A.   And also --

6          Q.   Okay.  Keep going.

7          A.   Sorry.

8          Q.   Sorry.

9          A.   The second page will have -- excuse me, the

10     third page for this document will be different.  The

11     breakdown of the total amount due will be different.

12     Where they contact their HUD agency will be

13     different.  And then their -- which is on page 4.

14     And then obviously the North Carolina office,

15     Commissioner of Banks information can be specific to

16     a loan -- to a state.

17         Q.   Well, this is the -- okay.  So, yeah, a

18     couple things.

19              The address of the banking commission would

20     vary from state to state, but in North Carolina it

21     would be the same?

22         A.   It should be the same.

23         Q.   Okay.  The -- the 45 days from date of

24     notice might vary from state to state they've

25     mentioned in this page 1?

```
1          A.   Correct.

2          Q.   It would -- but it might vary from state to

3     state, correct?

4          A.   Correct.

5          Q.   But in North Carolina it would be the same?

6          A.   It should be the same.

7          Q.   And everything else that -- other than what

8     you mentioned would be the same in North Carolina?

9          A.   Correct.  It should be the same.

10         Q.   And everywhere else?

11         A.   It should be the same.

12         Q.   Okay.  And everywhere else it would be the

13    same?

14         A.   Everywhere else in the United States?

15         Q.   Yeah.  Other than what you've lined up as

16    being specific to a state by state.

17         A.   I mean, it should be the same.  I haven't

18    reviewed all the other letters, but...

19         Q.   Okay.  And, yeah, you mentioned that --

20    because it's only Mrs. Hager who gets this letter.

21    Is it fair to say that Seterus' policy is that if

22    there are two borrowers on a loan, they would both

23    get an NC Final letter?

24         A.   Each individual should get a letter, yes.

25         Q.   Okay.  And you would agree that Mr. Hager's
```

117

```
 1     DM724 letter that was sent on this date, other than

 2     his name, is going to be identical?

 3         A.   I haven't seen it --

 4         Q.   Okay.

 5         A.   -- but yes, it should be.

 6         Q.   Okay.  That's fine.  Just a few more.  I

 7     promise.

 8              This is 12.

 9         (PLAINTIFFS' EXHIBIT NUMBER 12 WAS MARKED.)

10         Q.   Okay.  Do you recognize Exhibit 12?

11         A.   I do.

12         Q.   What's Exhibit 12?

13         A.   It is a correspondence to the Hagers

14     advising them that the late charge is credited back

15     to their account.

16         Q.   Okay.  And if you look at Bates 3149 --

17     okay.  Are you there?

18         A.   I am.

19         Q.   I couldn't find it for a second.  It's about

20     two-thirds of the way down, April 22, 2013, TP313

21     Fees and Cost Notice.

22         A.   I see it.

23         Q.   Is this entry, TP313 Fees and Cost Notice,

24     the memorialization of the sending of Exhibit 12?

25         A.   It is.
```

118

1      Q.    And all TP313 Fees and Costs Notices are

2      going to look similar to this with some changes?

3      A.    It should be similar.

4      Q.    What would the changes be?

5      A.    The date that the notice was sent; the

6      address to where it was sent; the name of the

7      customers; the loan number; the amounts that are

8      being credited; why -- what the description is; and

9      the dates that they've been credited or the date of

10     the charge.

11     Q.    Yeah.  Are the -- in a Fees and Cost Notice,

12     it could be credits and it could be debits?

13     A.    It could be.

14     Q.    Let me show you 13 just because I was

15     confused.

16      (PLAINTIFFS' EXHIBIT NUMBER 13 WAS MARKED.)

17     Q.    Have you seen Exhibit 13 before?

18     A.    I have.

19     Q.    What's Exhibit 13?

20     A.    It's a correspondence sent to the customers

21     on September 15, 2013, for a $15 property inspection

22     which was run on August 22, 2013.

23     Q.    And if you turn to 3129 in the big document.

24     A.    I'm there.

25     Q.    And is the entry 9/16 TP313 Fees and Cost

1        Notice, is that the memorialization of Exhibit 13?

2        A.   Yes.

3        Q.   Okay.  And although the formatting is

4     similar, it looks like there are some discrepancies

5     between Exhibit 12 and Exhibit 13.

6        A.   Correct.

7        Q.   Any way that you're aware that we would be

8     able to distinguish between Exhibit 12 and

9     Exhibit 13 as evidenced by the Loan Activity file?

10        A.   The description of a late charge; the,

11     again, remediation on -- on the property inspection

12     charge as opposed to when a credit is being made to

13     the account.  And then just asserting different

14     circumstances that might affect the Hagers on the

15     property inspection late charges as opposed to --

16     property inspection, not late charge, property

17     inspection notice as opposed to the late charge

18     notice.

19        Q.   Well, would you agree that there's nothing

20     in Exhibit 5 that would allow us to distinguish

21     between what's a -- what's a credit, what's a debit,

22     and what the circumstances are for it?

23        A.   With Exhibit 5 just being the --

24        Q.   The big document.

25        A.   -- activity, yeah.  No.  But a transaction

1    history might break that down.

2        Q.   Okay.  So if -- if we were -- if we wanted

3    to obtain the physical copy of any Fees and Cost

4    Notice, that would be how we would -- we could do

5    that?  That's -- that is something that could be

6    printed?

7        A.   Say that again.

8        Q.   If -- any Fees and Cost Notice is going to

9    be a TP313 Fees and Cost Notice as identified in

10   this big document, Exhibit 5?

11       A.   Okay.

12       Q.   Okay.  Is that correct?

13       A.   I believe so.

14       Q.   Okay.

15       A.   Can you rephrase that?

16       Q.   Yeah.  I just -- Exhibit 12 and Exhibit 13

17   are both coded as TP313 Fees and Cost Notices.  And

18   although the formatting appears to be very similar,

19   I mean one of them talks about debits and one of

20   them talks about credits.

21       A.   Correct.

22       Q.   Is there a way for us to determine in

23   Exhibit 5 which is which just by looking at

24   Exhibit 5?

25       A.   No.

121

1      Q.   Okay.  If we -- is there a way in MSP to

2      print out all of the letters that were sent TP313

3      Fees and Cost Notices so that we could then

4      determine which is a debit and which is a credit?

5      A.   We can pull the letters and there should be

6      a transaction history.

7      Q.   So those are memorialized somewhere which

8      version of the letter it is?

9      A.   Correct.

10     Q.   Okay.  And then this is 14.

11     (PLAINTIFFS' EXHIBIT NUMBER 14 WAS MARKED.)

12     Q.   Have you seen Exhibit 14 before?

13     A.   I have.

14     Q.   What's Exhibit 14?

15     A.   It's a notice advising the customer that

16     Seterus has not received the November 21, 2012,

17     payment.  The 15-day grace period has expired.  We

18     assessed a charge and just kind of advising them how

19     it might affect their credit.

20     Q.   Okay.  If you could turn in the big document

21     to 3156, which is near the end, second to the last

22     page.

23     A.   Okay.

24     Q.   And if you look at the entry two lines down,

25     11/28/2012, DQ114 Default Notice.

122

        1      A.   Yes.

        2      Q.   Is that the memorialization of the sending

        3   of Exhibit 14?

        4      A.   Yes.

        5      Q.   And all DQ111 Default Notices are

        6   substantially identical to Exhibit 14 with some

        7   exceptions?

        8      A.   Yes, should be.

        9      Q.   And what are the -- what are those

       10   exceptions?

       11      A.   The date that the notice is sent; where it

       12   was sent to; the amounts that are due; when they are

       13   due; the late charge that was assessed; how many

       14   days in the grace period there are.

       15      Q.   When you say the "days in the grace period,"

       16   are you referencing the sentence that says "Since

       17   your 15-day grace period has expired"?

       18      A.   Yes.

       19      Q.   Is that going to be dependent state to

       20   state?

       21      A.   I think it also is dependent on your Deed of

       22   Trust.

       23      Q.   Okay.  So some deeds of trust would have

       24   less than 15 days or some would have more?

       25      A.   It could, right.

123

1       Q.   Okay.  And everything else would remain the

2   same?

3       A.   It should.

4       Q.   Let's talk about suspense accounts.  What is

5   a suspense account?

6       A.   A suspense account is when a partial payment

7   is received to Seterus and is held on behalf of the

8   customer.

9       Q.   Okay.  When would a suspense account be

10  utilized?

11      A.   When the customer is making a partial

12  payment.

13      Q.   Okay.

14      A.   And a full loan installment cannot be

15  applied to the loan.

16      Q.   And that would -- so funds are placed in a

17  suspense account when the payment made is not enough

18  to cover the total amount due and owing?

19      A.   That's correct.

20      Q.   Okay.  And then they're held there, those

21  amounts are held in the suspense account until the

22  suspense account gets high enough to cover a single

23  month's payment?

24      A.   That's correct.

25      Q.   Is that right?

```
 1       A.   Yes.

 2       Q.   Okay.  And that's what -- that's what

 3   Seterus does when they receive a partial payment?

 4       A.   Puts it in a suspense account.

 5       Q.   Right.  Is that -- that's what Seterus does?

 6       A.   That's what Seterus does.

 7       Q.   And every time the Hagers submitted a

 8   partial payment, that's what they did?

 9       A.   That's correct.

10       Q.   Every time someone in North Carolina submits

11   a partial payment, that's what Seterus does?

12       A.   As long as they are in a payment acceptance

13   state of delinquency.  So if they're not a certain

14   number of days past due or if they -- they're not in

15   the foreclosure status, then we are taking their

16   payments.

17       Q.   Okay.  That's a good point.  Okay.

18            So in certain circumstances, the payments

19   are returned without being placed in a suspense

20   account; is that what you're saying?

21       A.   Yes.

22       Q.   In a foreclosure statement, for example?

23       A.   That's correct.

24       Q.   But if you all are accepting payments and

25   you get a partial payment, you put it in a suspense
```

1    account?

2        A.   That's correct.

3        Q.   And it's held there until the suspense

4    account is full enough to cover a single month's

5    payment?

6        A.   That's correct.

7        Q.   And that's the same -- you did that for the

8    Hagers -- the Hagers were always in a state where

9    you were accepting payments, correct?

10       A.   Yes.

11       Q.   They still are?

12       A.   Yes.

13       Q.   And so every time the Hagers made a partial

14   payment, you put it in a suspense account?

15       A.   That's correct.

16       Q.   And every time anyone in North Carolina

17   makes a partial, if you guys are accepting payments,

18   they're put in a suspense account?

19       A.   That's correct.

20       Q.   And any time anyone who you all are

21   accepting payments makes a partial payment, you put

22   it in a suspense account?

23       A.   As long as we're accepting payments --

24       Q.   Correct.

25       A.   -- correct.

126

1      Q.   Okay.  And is it fair to say then that once

2   the payment is put in the suspense account, a letter

3   will be generated, either Exhibit 9 or Exhibit 10,

4   and sent to them to indicate that's what you've

5   done?

6      A.   These are two examples of those letters,

7   yes.

8      Q.   Are there others?

9      A.   There could be.

10      Q.   Okay.  Are you aware of any others that

11   might be utilized that might be outlined in

12   Exhibit 5, the big document?

13      A.   On this specific loan, no.

14      Q.   Okay.  So do you think that these are the

15   types of letters that would get sent upon the

16   receipt of a partial payment?

17      A.   Yes.

18      Q.   Any idea why you would go sometimes

19   Exhibit 9 and sometimes Exhibit 10?

20      A.   I think the main difference being they're

21   different years that they were sent out.

22      Q.   Okay.  Okay.  So the -- the form used for a

23   partial payment on or about 2013 looks a lot like

24   Exhibit 10 and the form used in 2015 looks a lot

25   like Exhibit 9?

127

1          A.   Not necessarily.  And they are two different

2     letters, as we identified in the Exhibit 5.  Their

3     letter codes are different.

4          Q.   Okay.  But -- but they are sent upon the

5     receipt of a partial payment and the placement of

6     that partial payment in a suspense account?

7          A.   That's correct.

8          Q.   Okay.  Let's look at the Deed of Trust,

9     which is Exhibit 4.  I bet you know what question is

10    coming.  Have you reviewed this Deed of Trust?

11         A.   I have.

12         Q.   You reviewed it in preparation for this

13    deposition?

14         A.   I have.

15         Q.   If I asked you to -- to note what provides

16    Seterus the right to place money in a suspense

17    account, would you be able to identify it in the

18    Deed of Trust?

19         A.   I can, but I would prefer you point to it.

20         Q.   Well, my understanding is that it is located

21    on page 3, which is Bates number Hager 01-220.

22         A.   Okay.  And the specific area you want me to

23    focus on?

24         Q.   And my understanding is that it is Seterus'

25    contention in the lawsuit that Uniform Covenant

1          Number 1 provides them the right to place items in a

2          suspense account; is that correct?

3              A.   Again, I can speak to how Seterus -- that

4          Seterus has a suspense account and that we utilize

5          it on payments when we're receiving payments and

6          that's how we interpret the Deed of Trust.

7              Q.   Okay.  What part of it?

8              A.   We are governed by the Deed of Trust.

9                        (Cell phone rings.)

10             Q.   For the record, that wasn't me.

11                  MR. MINOR:  Or me.

12                  MR. MAGINNIS:  Noted.

13         BY MR. MAGINNIS:

14             Q.   Sorry, Ms. Jacobs.  And I know you're

15         governed by the Deed of Trust.  And so you would

16         agree that there would be need to be a provision in

17         the Note or the Deed of Trust that would allow

18         Seterus to do that, correct?

19             A.   It's a mortgage servicing, mortgage service

20         that we -- that we utilize, so...

21             Q.   Well, would you agree that when Seterus

22         takes money from a customer but does not apply it to

23         principal and interest and does not send it back,

24         the customer is limited in at least some way?

25                  MR. MINOR:  Object to the form.

129

1        A.   I don't agree.

2        Q.   Okay.  Say we put $800 in a suspense account

3    and it just sits there until the suspense account

4    gets high enough to make a single payment, okay?

5        A.   Okay.

6        Q.   The customer doesn't have their $800, right?

7        A.   The customer has sent it to apply to the

8    loan that they've taken out.

9        Q.   But it's -- and it -- so they don't have

10   their $800, right, because they sent it?

11       A.   They sent Seterus a payment of $800.

12       Q.   And they sent it to be applied?

13       A.   Okay.

14       Q.   Is that right?

15       A.   They sent a payment to Seterus.

16       Q.   And the -- if it's a check, the check is

17   cashed, correct?

18       A.   I don't know that.

19       Q.   Okay.  Well, if -- if a payment is made and

20   Seterus places it in a suspense account, is it your

21   testimony that Seterus doesn't endorse the money and

22   actually receive it?

23       A.   We endorse it and we receive the -- the

24   payments and apply it to the customer's suspense

25   account.

130

```
 1        Q.   Right.  And -- and so it's -- it is
 2   received, meaning the customer doesn't have the
 3   money anymore?
 4        A.   Correct.
 5        Q.   And it is not applied to principal or
 6   interest?
 7        A.   It is not.
 8        Q.   Okay.  And -- and so you would agree that
 9   the customer might prefer that it be applied to
10   principal or interest, right, or sent back?
11             MR. MINOR:  Object to the form.
12        A.   I don't know what the customer prefers.
13        Q.   Okay.  Let me just do it this way.  Is it
14   Seterus' position in this lawsuit that they need to
15   have some sort of contractual provision that
16   provides them to do that or that they can just do
17   it?
18             MR. MINOR:  Object to the form.
19        A.   We -- Seterus services by the Fannie Mae
20   guidelines, by the Note, and by the Deed of Trust.
21   So those are our provisional.
22        Q.   Okay.  And so those three provisional
23   documents would provide the rights of Seterus to act
24   as a servicer?
25        A.   That's correct.
```

131

1          Q.    And it would provide the obligations of

2    Seterus to act as a servicer?

3          A.    That is correct.

4          Q.    And it would govern Seterus' behavior with

5    regard to a particular loan?

6          A.    Yes.

7          Q.    So it would have to be somewhere in those

8    three documents that would provide their right to do

9    anything, correct?

10         A.    That's correct.

11         Q.    And that would include place things in a

12   suspense account?

13         A.    Sure.

14         Q.    Okay.  Is there anything in the Note,

15   Exhibit 3, that addresses suspense accounts, that

16   provides Seterus with that right to do -- to place

17   funds in a suspense account?

18         A.    Is there anywhere that you -- I mean can you

19   point me to a specific place?

20         Q.    I don't think there is any.  I'm asking you

21   if you think that there is.

22         A.    I know that Seterus, like I said, utilizes

23   suspense accounts for partial payments.  If there's

24   a specific area that you want me to focus on, I can

25   do that.  But I don't know that I want to speak to

1    a -- like a -- you know, and say if the Note -- I

2    know that the Note and the Deed of Trust governs

3    Seterus' rights to service the loan.

4        Q.   Okay.  Sitting here today, can you identify

5    any provision in Exhibit 3 which provides Seterus

6    the right to do that?

7        A.   This is a contract document.  I would defer

8    to my attorney to, you know, speak to that.  I

9    wouldn't speak to it.

10       Q.   Okay.  Sitting here today, can you refer to

11   any provision in Exhibit 4, the Deed of Trust, which

12   provides Seterus the right to do that?

13       A.   I know that it is outlined here.  If there

14   is a specific area that you want me to focus on, I

15   can do that.

16       Q.   Well, I want to focus on the whole thing.

17   And -- and I would like to know if what Seterus --

18   what their position is is if there is a provision in

19   Exhibit 4 that provides the right for Seterus to

20   take money, not apply it and put it in a suspense

21   account?

22       A.   There is a provision.  And we -- we service

23   based on the Deed of Trust, the Note, and the Fannie

24   Mae servicing guidelines.

25       Q.   Okay.  Which provision?

133

1         A.    "Application of Payments or Proceeds."  The

2    payment of principal, interest, escrow items,

3    prepayment charges and late charges.  I mean, the

4    entire Deed of Trust governs Seterus' rights with

5    the mortgages loan.

6         Q.    I agree with that.  But what provisions of

7    the Deed of Trust governs placement of money in

8    suspense accounts?

9              MR. MINOR:  Object to the form.

10        A.    Part of 2, or under the "Uniform Covenants,"

11   Number 2, it says in the second paragraph:

12             "If Lender receives a payment from the

13   Borrower for a delinquent Periodic Payment which

14   includes a sufficient amount to pay any late charge

15   due, the payment may be applied to the delinquent

16   payment and the late charge.  If more than one

17   Periodic Payment is outstanding, Lender may apply

18   any payment received from the Borrower to the

19   repayment of the payments (sic) -- payments if

20   applied to full payment of one or more of the

21   Periodic Payments."

22        Q.    Okay.  Is that the provision?

23        A.    That's one of them.

24        Q.    What are all of them?  What's the next one?

25        A.    Well, I just read one.  I mean...

```
 1        Q.   Is there another one?

 2        A.   There can be.

 3        Q.   Okay.  Where is it?

 4        A.   Well, I'm going to focus on this one for

 5   right now.

 6        Q.   Okay.

 7        A.   And it says "may accept that payment."

 8        Q.   Okay.  So just for clarity, you're

 9   referencing the second paragraph in "Uniform" --

10        A.   "Application of Payments or Proceeds."

11        Q.   Yeah.  In Uniform Covenant Number 2,

12   "Application of Payments or Proceeds"?

13        A.   That's correct.

14        Q.   And this paragraph addresses suspense

15   accounts?

16        A.   It -- it references payments that have been

17   made that are not satisfying the full contractual

18   payment due.

19        Q.   Okay.  Are there any other provisions in

20   Exhibit 4, the Deed of Trust, which address Seterus'

21   rights to place money in suspense accounts?

22             MR. MINOR:  Object to the form.

23        A.   Again, I'm sure there are.  I haven't

24   memorized the entire Deed of Trust that I would have

25   to read through the entire thing.
```

135

1       Q.    Okay.  But it's your position that somewhere
2       within the Note, the Deed of Trust, and Fannie Mae
3       servicing guidelines, somewhere within those three
4       documents, Seterus has the right to place money that
5       is less than a full payment in a suspense account?
6       A.    That's correct.
7       Q.    Okay.  And sitting here today with the Note
8       and Deed of Trust in front of you, other than the
9       one paragraph in paragraph 2, you are unable to
10      identify a specific provision?
11                  MR. MINOR:  Object to the form.
12      A.    I believe I identified the one that stood
13      out to me.
14      Q.    Right.  Just other -- I said -- I'm sorry if
15      I -- I didn't mean to misstate your testimony.
16      Other than that one paragraph that you outlined, "If
17      Lender receives a payment," the second paragraph in
18      Covenant 2, you're not able to identify any other
19      provision other than that one?
20                  MR. MINOR:  Object to the form.
21      A.    Again, like I said, you know, I'm sure there
22      are -- it is in here.  I just -- I'm not reading it
23      out to you.  That's it.
24      Q.    Okay.  Well, if you would like to review the
25      entire thing and then get back to me, that's fine.

1      A.   Okay.

2      Q.   Would that be better?

3      A.   We can do that.

4      Q.   Okay.  Do we want to go off or do we want to

5      just --

6              MR. MINOR:  Yeah.  We can go off.

7              MR. MAGINNIS:  Yeah. we can go off.

8      That's fine.

9              MR. EDWARDS:  Off at 12:48.

10              (Recess taken from 12:48 to 12:58.)

11              MR. EDWARDS:  Back on the record at

12      12:58.

13      BY MR. MAGINNIS:

14      Q.   Okay.  Ms. Jacobs, during the break, did you

15      have a chance to review the Deed of Trust,

16      Exhibit 4?

17      A.   I did.

18      Q.   And are there any provisions that Seterus

19      would like to identify as ones that provide them

20      with the right to place money in a suspense account?

21              MR. MINOR:  Object to the form.

22      A.   On Hager Bates page 01-0220, under "Uniform

23      Covenants," both paragraph 1 and 2 are applicable in

24      identifying the use of a suspense account.

25      Q.   Okay.  Any other provisions?

1          A.    None that stood out to me, no.

2          Q.    Okay.  Can late fees be paid with the money

3     out of the suspense account?

4          A.    They can.

5          Q.    Or other -- property inspection fees?

6          A.    Yes.

7          Q.    Okay.  We talked about if there's enough in

8     the account to pay off a principal balance.  Is --

9     how would they be applied to pay off a late fee?

10                MR. MINOR:  Object to the form.

11         A.    What do you mean?

12         Q.    Well, is it as simple as if there's money in

13    the account to pay the late fee it gets applied?

14         A.    If the full loan installment is made and

15    then the late fee is assessed with that loan, so I

16    mean the late fee is associated with the -- with the

17    payment that is due.  So a monthly payment, for

18    example, today is the 18th -- 19th -- if a monthly

19    payment was made today, it's the principal,

20    interest, tax, and insurance payment plus the late

21    fee is the total payment.

22         Q.    Okay.  So if a customer is a year behind,

23    just hypothetically --

24         A.    Okay.

25         Q.    -- and so from January to December they

138

1       didn't make any payments --

2           A.   Right.

3           Q.   -- but you all are willing to continue

4       accepting them.  The first -- the suspense account

5       would need to get up to an amount equal to the

6       principal and interest payment from January, before

7       January is applied?

8           A.   And the late charge.

9           Q.   And then -- oh, and -- and for the late fee

10      to be paid?

11          A.   Correct.

12          Q.   So the late fee for January would get paid

13      before any payment for February?

14          A.   That's my understanding.

15          Q.   Okay.  And we talked a little bit earlier

16      about how Seterus makes money.  Do you have an

17      understanding about whether Seterus gets to keep the

18      late fee charges?

19               MR. MINOR:  Object to the form.

20          A.   I don't know.

21          Q.   It would depend on what the Note, Deed of

22      Trust, and Fannie Mae servicing guidelines say?

23               MR. MINOR:  Object to the form.

24          A.   Again, not my determination.  I don't know.

25          Q.   Well, would there be any other document

1    other than those three that would be relevant?

2                   MR. MINOR:  Same objection.

3         A.   Again, I don't know.

4         Q.   And you would agree that the Hagers' loan

5    has never been accelerated?

6         A.   It has not been accelerated that I know of

7    while Seterus was servicing the loan.

8         Q.   Well, and -- and whether it -- if it had

9    been accelerated, would that show up in the data

10   points for when Seterus acquires the servicing

11   rights?

12        A.   I would assume it would.

13        Q.   You can't decelerate it once -- you can only

14   accelerate once, right?

15        A.   Can accelerate, a customer can -- yeah.  Can

16   reinstate the loan.

17        Q.   Okay.  Let's talk about property inspection

18   fees.

19             When is a property inspection fee

20   authorized?

21        A.   A property inspection fee is assessed on any

22   loan that's 30 days past due.  30 -- yeah.  I

23   believe -- my understanding is 30.  Yeah.  I'm going

24   to say that.

25        Q.   My understanding is that at least with

140

1     regard to this loan, is that it's -- if it's 45 days

2     past due and then 30 days after.  That does that

3     refresh your recollection?

4         A.   Yeah, it does.

5         Q.   Does that sound right to you?

6         A.   Yes.

7         Q.   Okay.  And you said the inspection fee is

8     assessed.  What do you mean?

9         A.   We send out a third-party vendor to go out

10    and make sure that the property is in good standing

11    condition and secure.

12        Q.   And -- and so when you say "assessed," it

13    would be -- the inspection does have to take place

14    for it to be assessed?

15        A.   It does.

16        Q.   Okay.  So once the inspection takes place,

17    the fee is assessed?

18        A.   That's correct.

19        Q.   And with regard to Hagers, you utilize

20    Safeguard, a company called Safeguard?

21        A.   That's correct.

22        Q.   Is that who Seterus uses for all property

23    inspections?

24        A.   I want to say the majority of our

25    inspections are done by Safeguard.

141

1      Q.   Okay.  And does Seterus have a contract with

2      Safeguard regarding those property inspections?

3      A.   They're our third-party vendor.  We utilize

4      them.  I'm not aware of a contract that's in place.

5      Q.   Okay.  And I think you said you do this to

6      determine whether the property is occupied and in

7      good repair?

8      A.   It's secure and in good standing.

9      Q.   Okay.  "Secure and in good standing"?

10     A.   Yeah.

11     Q.   What does that mean?

12     A.   Secure meaning that there are -- there's not

13     anyone that's not supposed to be there that's kind

14     of, you know -- if the -- for example, if the

15     property is vacant, there isn't someone that's not

16     supposed to be there that's kind of taken over the

17     property and the property is not -- their windows

18     are not broken.

19         Good standing in that the physical property

20     is standing up.  There hasn't been any damage to it;

21     there's not a tree on it, et cetera.

22     Q.   Okay.  So secure, you're looking out for

23     squatters and then -- is that right?

24                  MR. MINOR:  Object to the form.

25     A.   Or animal --

142

```
 1        Q.   You can answer it.

 2        A.   Or animals --

 3        Q.   Okay.

 4        A.   -- or, you know, any kind of damage that

 5   could be done that could make a property unsecure.

 6        Q.   Okay.  And so that's secure.  And then in

 7   good standing, what was that again?

 8        A.   That it's -- good standing is that there is

 9   no environmental damage that we can assess to the

10   property.

11        Q.   Okay.  And that's -- that's why -- to

12   determine whether it's secure and in good standing,

13   that's why Seterus conducts property inspections?

14        A.   That's correct.

15        Q.   Okay.  And to ensure that it's secure and in

16   good standing is the way that you have a right to do

17   it under the Note, Deed of Trust, and Fannie Mae

18   servicing guidelines?

19        A.   That's correct.

20        Q.   There's no other reason to do it?

21        A.   No.

22        Q.   Okay.  And you charge for those property

23   inspection fees, correct?

24        A.   There is a charge assessed, yes.

25        Q.   They're assessed -- it's assessed to the
```

143

1      customer's account?

2          A.   That's correct.

3          Q.   And is the -- is the money that's paid to

4      Safeguard the same as the amount that's charged to

5      the account?

6          A.   To my knowledge, yes.

7          Q.   Okay.  Seterus doesn't make any money on

8      that?

9          A.   I don't believe so.

10         Q.   Okay.  It is added to the -- the property

11     inspection fee is added to the amount due and owing

12     on the account?

13         A.   Yes.

14         Q.   Okay.

15         A.   The total amount due.

16         Q.   Okay.  Let's mark 15.  I'm showing you a

17     document that's been marked as Exhibit 15.

18         (PLAINTIFFS' EXHIBIT NUMBER 15 WAS MARKED.)

19         Q.   Have you seen Exhibit 15 before?

20         A.   I've seen a copy of it.

21         Q.   Okay.  What is Exhibit 15?

22         A.   It looks like a -- a letter that was sent to

23     the Hagers that has been written on by someone.

24         Q.   Any idea whose handwriting it might be?

25         A.   I don't.

144

```
 1        Q.   Okay.  And is this just a copy -- other than

 2     the handwriting document, this is a copy of an

 3     account statement for November 16, 2012, that would

 4     have been sent to the Hagers?

 5        A.   That -- yes, essentially.

 6        Q.   And just because we're talking about

 7     property inspections, if you look down, there's a

 8     $15 charge for property inspections.

 9        A.   I see it.

10        Q.   And is that indicative that a property

11     inspection took place?

12        A.   It is, yeah.  November 14, property

13     inspection $15.

14        Q.   And that -- and that amount --

15        A.   2012.

16        Q.   The November 14, 2012, $15 charge, would

17     that be added to the amount that would need to be

18     paid to bring the account current?

19        A.   Yes.

20        Q.   And would that charge be something that

21     would need to get paid off along with principal,

22     interest, and late fees in order to move money out

23     of the suspense account?

24        A.   I believe the suspense account is specific

25     to the principal, interest, taxes, insurance and
```

1      late charge fee.

2          Q.   Okay.  So the property inspection is

3      separate?

4          A.   I believe so.

5          Q.   When does that get applied?

6          A.   It's applied in the total arrears, the total

7      arrears to the account.

8          Q.   Okay.  And but it is added to the total

9      amount due and owing?

10          A.   Yes.

11          Q.   And it is added to a payoff figure?

12          A.   Yes.

13          Q.   Okay.  And this is 16.

14          (PLAINTIFFS' EXHIBIT NUMBER 16 WAS MARKED.)

15          Q.   Have you seen Exhibit 16 before?

16          A.   I have.

17          Q.   What's Exhibit 16?

18          A.   It is the comment code and comment detail of

19      an incoming call that one of our customer service

20      agents took from the customer.

21          Q.   And there's a -- it looks like there was a

22      variety of discussions during this call.  But do you

23      see that there's a reference to a property

24      inspection?

25          A.   "Customer asked to ref property inspection."

146

1        Q.    Right.  And then the next sentence:

2              "I advised and time" -- any time -- is it

3        "any time the account is more than 30 days

4        delinquent a property inspection will be assessed to

5        account to ensure account was not vacant"?

6        A.    Yes.  That's what it read.

7        Q.    I think I -- I may have changed some words,

8        but is that a correct recitation of the policy?

9        A.    That's what's been stated by this customer

10       service agent, yes.

11       Q.    Okay.  And -- and would that be in reference

12       to the November 14, 2012, property inspection?

13       A.    The customer doesn't identify which specific

14       property inspection he's speaking of.  I'm sure

15       there were property inspections conducted with the

16       prior servicer as well that could be.  I mean I

17       don't really know.

18       Q.    Well, if there was a property inspection on

19       November 14, 2012, would there have been another

20       property inspection prior to December 6th of 2012?

21       A.    No.

22       Q.    Because they're every 30 days?

23       A.    Correct.

24       Q.    Okay.  And -- and do you see where the

25       customer advised that he lives on a long driveway

1      with cameras and -- and no one has come to view the

2      house?

3          A.   I see that.

4          Q.   Okay.  And are customer service agents

5      trained to memorialize the contents of the

6      conversation with the customer?

7          A.   Yes.

8          Q.   Such that the customer probably said

9      something along those lines during the conversation?

10         A.   Yes.

11         Q.   Okay.  This is 17.

12          (PLAINTIFFS' EXHIBIT NUMBER 17 WAS MARKED.)

13         Q.   Have you seen Exhibit 17 before?

14         A.   Yes.

15         Q.   Okay.  What is Exhibit 17?

16         A.   It is a written response to the Hagers from

17     our consumer and government affairs team.

18         Q.   And this would have been in response to some

19     sort of submission by the Hagers either to Seterus

20     or to some sort of government agency?

21         A.   That's correct.

22         Q.   And I know that they did submit quite a few

23     of such submissions.

24              Do you see the reference on page 2 to the

25     property inspections?

148

```
 1        A.    Yes.

 2        Q.    The last paragraph?

 3        A.    I see it.

 4        Q.    And it -- it talks -- is it fair to say that

 5   it talks about that you need to do at least one

 6   property inspection to confirm that you can't view

 7   the property from the street?

 8        A.    Yes.

 9        Q.    And it says that subsequent inspections were

10   not ordered because you can't see the property from

11   the street?

12        A.    That's what the letter says.

13        Q.    And is that Seterus' policy with regard to

14   property inspections?

15        A.    That's my understanding.

16        Q.    Because if the only purpose is to determine

17   if they're secure and in good standing and you can't

18   actually see the home, there's no purpose to do it,

19   right?

20              MR. MINOR:   Object to the form.

21        A.    Again, I can only speak to what the -- the

22   letter says.

23        Q.    Well, and not so much the letter, and I

24   don't want you to opine on intent, but is the policy

25   that if you cannot access the property, then you do
```

149

1    not conduct property inspections -- property

2    inspections?

3        A.   As of April 29, 2013, that's the

4    understanding.

5        Q.   Is that the policy today?

6        A.   That was given to this customer.

7        Q.   Okay.  Is that the policy today?

8        A.   I would have to check to make sure that

9    that's still the policy.

10        Q.   Do you have an understanding about what

11    Fannie Mae's servicing guidelines say about property

12    inspections?

13        A.   That a property inspection should be capped

14    on any account that's delinquent a certain number of

15    days every 30 days.

16        Q.   Are you aware what Fannie Mae servicing

17    guidelines say about drive-by inspections?

18        A.   I have very limited knowledge.  I would have

19    to review it.

20        Q.   Have you heard of a drive-by inspection?

21        A.   I'm not familiar -- too familiar with it.

22        Q.   Do you have a guess as to what that might

23    refer to?

24        A.   I wouldn't want to guess.

25        Q.   Okay.  Do you have knowledge about what that

1    might refer to?

2        A.    I don't.

3        Q.    If I represented to you that a drive-by

4    inspection would be an inspection in which the

5    inspector drives by but does not access the actual

6    property, would you have any reason to dispute that?

7        A.    I mean, I don't know that that's a

8    definition that Seterus utilizes, so I couldn't -- I

9    wouldn't be able to make that determination.

10        Q.    Would Seterus follow the guidelines for

11    inspecting property that are given by the Note, by

12    the Deed of Trust, and by Fannie Mae servicing

13    guidelines?

14        A.    Yes.

15        Q.    Okay.  And if Fannie Mae servicing

16    guidelines indicate that you can only do a drive-by

17    property inspection in the event of a bankruptcy or

18    a -- issues with safety, would Seterus comply with

19    those guidelines?

20              MR. MINOR:  Object to the form.

21        A.    Seterus complies with the Fannie Mae

22    guidelines as they -- as they are written.

23        Q.    All guidelines?

24        A.    As the Fannie Mae guidelines, as they're

25    written.

1        Q.   Right.  Good one.  All Fannie Mae guidelines

2   as they are written?

3        A.   Yes.

4        Q.   So Seterus complies with them?

5        A.   That's correct.

6        Q.   Including, but not limited to property

7   inspections?

8        A.   That's correct.

9        Q.   Okay.  Let's mark this as 18.

10         (PLAINTIFFS' EXHIBIT NUMBER 18 WAS MARKED.)

11        Q.   Have you seen Exhibit 18 before?

12        A.   I have.

13        Q.   What's Exhibit 18?

14        A.   It is a Safeguard no contact -- well, it's

15   an invoice.

16        Q.   Okay.  And then there's a second page

17   that -- is this indicative of what the no contact

18   inspection might entail?

19               MR. MINOR:  Object to the form.

20        A.   This is a property inspection that Safeguard

21   conducted.  It's titled as "No contact inspection"

22   as the work order.  I mean, I can represent that

23   these are the photos that they took for that no

24   contact inspection.

25        Q.   Is that what's typically provided to Seterus

152

1 in a no contact inspection, a bill and photographs?

2 A. And an invoice, yes, and a Safeguard

3 invoice.

4 Q. Yeah.  Does -- how does it work in terms of

5 the authorization to conduct the inspection?  Does

6 Seterus have to tell -- authorize Safeguard in some

7 fashion to go do the inspection?

8 A. Yes.

9 Q. Safeguard just doesn't do it on their own?

10 A. That's correct.

11 Q. Does Safeguard authorize the type of

12 inspection -- or Seterus, I'm sorry?

13 A. Seterus does, yes.

14 Q. So Seterus authorizes the type of

15 inspection?

16 A. Yes.

17 Q. If Safeguard performed a no contact

18 inspection, it's because Seterus told them to do a

19 no contact inspection?

20 A. That's correct.

21 Q. Okay.  And you identified the date the

22 inspection was completed on July 24, 2013?

23 A. That's correct.

24 Q. Do you have an understanding of why a no

25 contact inspection was conducted on July 24th of

153

1      2013?

2          A.   To identify if the property was in good

3      standing and secure condition.

4          Q.   Okay.  Well, in April 29th of 2013, Ms. --

5      I'm assuming it's a Ms. -- Cerda, in Exhibit 17,

6      wrote a letter to the Hagers in response to a

7      government investigation where she said we only

8      completed one inspection and we've determined that

9      we can't access the property to determine if it's in

10     secure and good standing --

11              MR. MINOR:  Object to --

12         Q.   -- correct?

13              MR. MINOR:  Object to the form.

14         A.   She stated that:

15              "A property inspection was completed once by

16     Seterus.  With that inspection, we determined that

17     we are not able to view the property from the street

18     and subsequent inspections were not ordered.  We

19     would not have been able to determine that we could

20     view the property without ordering that initial

21     inspection," is what she stated.

22         Q.   Right.  And -- and when I asked you about

23     what Seterus' policy when they can't access the

24     property, it was your testimony that subsequent

25     property inspections would not be ordered.

154

1      A.   I repeated what Ms. Cerda had stated, that

2   at that time, no additional -- she's stating that no

3   additional property inspections were ordered at that

4   time.  But that doesn't necessarily mean that we are

5   not allowed to continue to see if at any point that

6   the property is able to be seen or not.

7           So the whole idea is that we were able to

8   determine that we weren't able to see the property

9   from the street at that -- at that time.  And then

10   this -- this property inspection was conducted.

11      Q.   Okay.  So Seterus can order new no contact

12   inspections in order to see if the house has moved?

13      A.   To --

14           MR. MINOR:  Object to the form.

15      A.   To see if there's any change in the -- in

16   the -- when the inspector goes by to see if he can

17   make any identifiable differences from the previous

18   report.

19      Q.   Okay.  So if a property inspection

20   determines that a property cannot -- it can't be

21   determined whether it's secure and in good standing,

22   Seterus will still order subsequent property

23   inspections to determine if that is still the case?

24      A.   In this scenario, that's what it seems as if

25   was conducted.

1      Q.   Okay.  Why would it be a no contact

2   inspection?

3      A.   Given that Seterus -- or Safeguard was

4   unable to identify or make contact with the property

5   itself.

6      Q.   Well, that's not what you said earlier.

7   What you said earlier is that Seterus would

8   determine whether it was going to be a no contact

9   inspection or not, correct?

10      A.   Correct.

11      Q.   Okay.  So why did Seterus determine it was

12   going to be a no contact inspection?

13      A.   Based on the representation in the letter

14   that we're not able to see the property initially,

15   and so when we do the second property inspection or

16   when this property inspection was conducted with the

17   photos that are attached, it was -- it was a no

18   contact inspection.

19           We will run the inspection, and then if

20   further information is needed, if another assessor

21   needs to be sent out, for example, if an inspector

22   goes out to a property and identifies they can see

23   property -- they can see damage, they don't

24   necessarily go out and conduct that research on

25   their own.  They will send somebody else to go back.

1          So the initial -- the initial inspection

2     will be a no contact.  And then that inspection will

3     identify if further -- further property inspections

4     are needed or not.

5          Q.   Okay.  So does Exhibit 18 identify whether

6     further property inspections are needed?

7          A.   This exhibit does not identify that.

8          Q.   Okay.  What are the identifying factors that

9     determine whether a subsequent property inspection

10    is needed?

11         A.   Again, with the goal being identifying that

12    the property is in good standing and secure, we're

13    trying to maintain and make sure that that property

14    is in good standing and secure.  Those would be

15    the -- those would be what we're looking for.

16         Q.   Seterus wouldn't just charge fees for no

17    reason, right?

18         A.   Seterus does not just charge fees, no.

19         Q.   The only reason you would do a property

20    inspection is if you could actually determine

21    whether the property was secure and in good

22    standing, correct?

23              MR. MINOR:  Object to the form.

24         A.   To maintain that a property is in good

25    standing.

157

1        Q.   Okay.  And if you -- would you agree that if

2    Seterus cannot determine that based upon the

3    topography of the land of the property in question,

4    then Seterus wouldn't need to do further

5    inspections?

6              MR. MINOR:  Object to the form.

7        A.   In my role, I'm not -- I don't make the

8    determination whether Seterus needs to do something

9    or not.  I am here to speak on this loan file and

10   speak to the fact that a property inspection was

11   conducted and it was requested by Seterus and

12   therefore Safeguard went out and did the property

13   inspection.

14       Q.   Okay.  Why was it requested?

15             MR. MINOR:  Object to the form.

16       A.   Because it was a Seterus request.

17       Q.   Okay.  For what reason?

18       A.   To maintain that the property was in good

19   standing and secure.

20       Q.   Okay.  And I'm talking about drive-by

21   inspections.  Do you think Fannie Mae servicing

22   guidelines address no contact inspections?

23             MR. MINOR:  Object to the form.

24       A.   Again, the Fannie Mae guidelines speak for

25   themselves.  I don't make a determination one way or

1    another.

2        Q.   And Seterus aims to comply with those

3    servicing guidelines with regard to property

4    inspections and everything else?

5        A.   That's correct, Seterus does.

6        Q.   And if those guidelines regarding no contact

7    or drive-by inspections said that a servicer should

8    only do that in the instance of a bankruptcy or a

9    safety issue, then Seterus would attempt to comply

10   with that?

11       A.   Could you rephrase that question?

12       Q.   Sure.  If -- if the Fannie Mae servicing

13   guidelines addressing property inspections indicate

14   that no contact inspections or drive-by inspections

15   should only be done in one of two instances, one,

16   bankruptcy, two, safety, Seterus would attempt to

17   comply with that?

18       A.   Seterus complies with the Fannie Mae

19   guidelines.

20       Q.   Are you aware if the Hagers have ever filed

21   for bankruptcy?

22       A.   I am not aware.

23       Q.   Would that be in the loan file?

24       A.   It should be.

25       Q.   You can't attempt to collect if somebody is

1     in bankruptcy, right?

2         A.   Again, I --

3              MR. MINOR:  Object to the form.

4         A.   -- can't make that determination.

5         Q.   Well, does Seterus have a policy of

6     identifying when borrowers have filed petitions for

7     bankruptcy such that they can take steps consistent

8     with the bankruptcy code?

9         A.   Yes.

10        Q.   It would be in the file if Seterus was aware

11    of a bankruptcy?

12        A.   Yes.

13        Q.   Okay.  All right.  This is 19.

14        (PLAINTIFFS' EXHIBIT NUMBER 19 WAS MARKED.)

15        Q.   Have you seen Exhibit 19 before?

16        A.   I have.

17        Q.   What's Exhibit 19?

18        A.   It's an account statement to Michael and

19    Cynthia Hager, statement date 9/16/2013.

20        Q.   And do you see the reference to "Property

21    inspections"?

22        A.   I do.

23        Q.   And there's a $15 charge to their account?

24        A.   Yep.

25        Q.   And that's added to the amounts that they

1     would owe Seterus?

2          A.   Yes.

3          Q.   Okay.  And would that be in reference to

4     this July 24th invoice and photos, Exhibit 18, or

5     would it be a different one?

6          A.   Again, I couldn't say just by looking at

7     this.

8          Q.   Well, kind of the same as before.  If there

9     was an inspection completed on July 24, 2013, would

10    Seterus charge them for a different property

11    inspection on August 22, 2013?

12         A.   To my knowledge, no.

13         Q.   So they got charged for work in Exhibit 18,

14    it was added to the account?

15         A.   Again, I can't make that determination.

16         Q.   Do you have an understanding of when it's a

17    $15 charge versus a different charge from the --

18    Safeguard?

19         A.   As I explained a little earlier, it just

20    depends on what is needed after that inspection is

21    conducted.  So that would identify if a charge is --

22    if there's a higher charge or if there's more work

23    needed.

24         Q.   Okay.  So would $15 be the minimum charge

25    for a no contact?

1        A.    I wouldn't want to guess.

2        Q.    Okay.  Are you aware of any charge that

3    would be lower than that, $15?

4        A.    I haven't seen a charge that's lower than

5    that.

6        Q.    Okay.  And then if they're doing more work,

7    like mowing the lawn, it might be a higher charge?

8        A.    That's correct.

9        Q.    Okay.  All right.  This is 20.

10       (PLAINTIFFS' EXHIBIT NUMBER 20 WAS MARKED.)

11       Q.    Have you seen Exhibit 20 before?

12       A.    I have.

13       Q.    What is Exhibit 20?

14       A.    It is an account statement sent by Seterus

15   to Michael and Cynthia Hager on November 18, 2013.

16       Q.    And do you see reference to "Property

17   inspections"?

18       A.    I do.

19       Q.    And it's a $15 charge?

20       A.    Yes.

21       Q.    And would that be for a no contact

22   inspection?

23       A.    I can't make that determination just based

24   on this account statement.

25       Q.    Some sort of inspection conducted by

1    Safeguard?

2         A.    A property inspection, yeah.

3         Q.    Which Seterus authorized?

4         A.    Yes.

5         Q.    And charged the clients or charged Mr. and

6    Mrs. Hager for it on their account?

7         A.    Yes.  Uh-huh.

8         Q.    And I'll represent to you that we have not

9    received any invoice or photographs similar to

10   Exhibit 18 with regard to this property inspection.

11   Do you know why that might be?

12        A.    I don't know.

13        Q.    Do you know -- does Seterus need to receive

14   an invoice and some sort of representation that work

15   was completed before assigning this fee?

16        A.    I can't make that determination.

17        Q.    Okay.  Would they need to get -- would

18   something needed to be added to the loan file in

19   order to assess a fee?

20        A.    That -- yes.  A certification that the

21   property inspection was conducted.

22        Q.    Right.  And that would be in the loan file?

23        A.    It would be -- or would contact our property

24   contact team's conversation with Safeguard.

25        Q.    And the certification, would that -- is that

163

1    the invoice and the pictures or is that something

2    different?

3        A.    It could be the invoice and the pictures.  I

4    know that those are assessed with each property

5    inspection, but sometimes it could just be -- you

6    know, I mean, I -- I wouldn't want to make -- make a

7    guess that it's only limited to an invoice.

8        Q.    If a customer calls with questions about

9    their account, does the customer service

10   representative who they deal with have access to the

11   loan file?

12       A.    They have -- they do have access to the loan

13   file, but it can be limited access to the loan file.

14   Limited to their job functions.

15       Q.    If it's not in the loan file, how can we

16   confirm that this invoice and pictures exist?

17              MR. MINOR:  Object to the form.

18       A.    The loan file is -- is, again, a sum of all

19   the documents associated with the loan.  Your

20   question was about the customer service agent's

21   access.  They might not necessarily have access to

22   the property inspection invoice, but the property

23   inspection team will have access to it.

24       Q.    Well, let me ask you a different question

25   then.  If an invoice and pictures are not in the

164

1      loan file, where would they be with regard to the

2      Hagers?

3         A.   Your guess is as good as mine.  I'm not

4      sure.

5         Q.   Okay.  So -- so Seterus wouldn't have any

6      idea where to find it if it wasn't in the loan file

7      with regard to a specific inspection performed on

8      the Hagers' property?

9         A.   That's correct.

10        Q.   And if it's not in the loan file, it still

11     may have been charged?

12        A.   No.  We would have it.

13        Q.   Do you have to receive the invoice in order

14     to charge?

15        A.   We have invoices for -- like I said earlier,

16     we have invoices for all the property inspections

17     that we have charged.

18        Q.   And they would all be in the loan file?

19        A.   They would be.

20        Q.   And the entire loan file was produced to the

21     Hagers in this lawsuit?

22        A.   Okay.

23        Q.   Is that right?

24        A.   I mean, I can't make the representation of

25     all the documents.

165

1        Q.   Okay.  Would there be any charge added to

2   the account for a property inspection when an

3   invoice was not in the loan file?

4        A.   Again, like I mentioned, every property

5   inspection charge is associated with a property

6   inspection that was conducted.

7        Q.   Right.  And every property inspection that

8   was conducted produces some sort of work product,

9   which is an invoice and then something indicating

10  what they did?

11       A.   It should provide something, yeah.

12       Q.   And each and every invoice that's associated

13  with a particular customer should be placed in their

14  loan file?

15       A.   Invoice or otherwise, yes.

16       Q.   Some sort of documentation reflecting that

17  this actually happened?

18       A.   Yeah.  With -- yes, correct.

19       Q.   And if it wasn't placed in the loan file,

20  then the Hagers would not be charged?

21       A.   The property -- no.  The property inspection

22  team would have access to a particular document.

23       Q.   Okay.  Who -- who adds the charge to the

24  file?  Is that the property inspection team?

25       A.   Yes.

166

```
1         Q.    Okay.  Do they have to have some sort of
2    confirmation from Safeguard that an inspection took
3    place before they do that?
4         A.    They have conversations with Safeguard about
5    it, yes.
6         Q.    Like a telephone conversation?
7         A.    Again, I am very limited in my knowledge of
8    what they do.  But I believe -- it is my
9    understanding that with each charge that's
10   associated, the property inspection team has access
11   to greater information that might be needed.
12        Q.    And would they assess a fee if they just got
13   a phone call from Safeguard that said, hey, we
14   looked at it --
15        A.    Again --
16        Q.    -- or would they need to get an invoice?
17        A.    Again, I don't -- I can't make that
18   determination just based on my knowledge.
19        Q.    If they didn't get an invoice, how would
20   they pay it?
21        A.    Again, I can't make a determination based on
22   my knowledge of -- of it.
23        Q.    And if they didn't get an invoice and didn't
24   pay it and assessed it to the account, wouldn't that
25   be a problem?
```

167

1      A.   Again, based on my understanding, I've

2   represented what I know.

3      Q.   Okay.  21.

4       (PLAINTIFFS' EXHIBIT NUMBER 21 WAS MARKED.)

5      Q.   Oh, sorry.  You get the yellow one.  Have

6   you seen Exhibit 21 before?

7      A.   Yes.

8      Q.   What's Exhibit 21?

9      A.   It is a Safeguard invoice.

10      Q.   What is it a Safeguard invoice for?

11      A.   In the description it says it's

12   "Bankruptcy -- No Contact."

13      Q.   Okay.  And -- and we talked about this

14   before.  It's -- it's -- they receive that

15   information regarding the scope of their review from

16   Seterus?

17      A.   Yes.

18      Q.   And so the invoice is actually to the

19   Seterus bankruptcy department; do you see that?

20      A.   Yes.

21      Q.   So is it fair to say that Safeguard would

22   have received an indicator from Seterus that this

23   item was in -- that the Hager property was subject

24   to a bankruptcy?

25      A.   Subject to.

168

 1          Q.   Was involved in a bankruptcy, correct?

 2          A.   Based on this document, I cannot tell if the

 3     Hagers were involved in a bankruptcy.

 4          Q.   Well, that's not my question.  My question

 5     is, Seterus would have informed Safeguard to treat

 6     this as if the Hagers were in a bankruptcy, correct?

 7          A.   Again, just based on this invoice, it

 8     doesn't -- I can't make that determination, but it

 9     does say "Bankruptcy - No Contact" description.

10          Q.   And they mailed it to the bankruptcy

11     department?

12          A.   It does seem so.

13          Q.   Okay.  And we talked about this earlier.

14     Seterus doesn't have any information to suggest that

15     the Hagers were in bankruptcy, correct?

16          A.   I said that I couldn't make that

17     determination.

18          Q.   Well, is there anything in the Hagers' loan

19     history that would suggest that they're in

20     bankruptcy?

21          A.   Again, in my -- I said that I could not make

22     that determination.

23          Q.   Well, you -- you've reviewed the loan file,

24     correct --

25          A.   Yes, I have.

1        Q.   -- in preparation for this deposition?

2              Did you see anything in there that indicated

3    that the Hagers said they were in bankruptcy?

4        A.   I reviewed the entire loan file.  I don't

5    recall anything specifically standing out to me that

6    was -- that outlined that they were in bankruptcy.

7        Q.   And this isn't the first loan file for

8    Seterus you've ever reviewed, correct?

9        A.   That's correct.

10       Q.   And have you seen a loan file before that

11   had indicated that they were in bankruptcy?

12       A.   I have.

13       Q.   What is -- what is indicated in the loan

14   file?  Does it have the bankruptcy court filings?

15       A.   Depending on if it's an active bankruptcy or

16   a discharge.

17       Q.   Okay.  Would there be a discharge order or

18   at least a reference to a discharge?

19       A.   If it's not active, if it's not an active

20   bankruptcy, then it wouldn't stand out.

21       Q.   Well, there -- would there be some sort of

22   indicator in the form that a bankruptcy had either

23   taken place or was ongoing in the loan file?

24       A.   I'm sure there would be.

25       Q.   Okay.  And you reviewed the Hagers' loan

1    file?

2        A.   I have.

3        Q.   And there's nothing in the loan file that

4    suggested that they were ever in bankruptcy?

5        A.   I didn't make that -- I didn't make that

6    statement.  I said I just couldn't make that

7    determination.

8        Q.   Okay.  Well, did you see anything when you

9    reviewed the loan file?

10       A.   I said that I could not make that

11   determination.  I didn't --

12       Q.   Did you see -- when you reviewed the loan

13   file, did you see any indicator that would suggest

14   that the Hagers have ever been in bankruptcy?

15       A.   Again, I reviewed the entire loan file.

16   Nothing that just stood out to me.

17       Q.   So you didn't see anything?

18       A.   I said I could not make that determination.

19       Q.   Okay.  And Seterus follows the Fannie Mae

20   guidelines on property inspections, correct?

21       A.   That's correct.

22       Q.   And if Fannie Mae said you can only do a no

23   contact property inspection in the event of a

24   bankruptcy or a safety issue, Seterus would abide by

25   that?

1      A.   That's correct.

2      Q.   And so the only authority from Fannie Mae

3   that Seterus would have to conduct a property

4   inspection for the Hagers would be if you said it

5   was a bankruptcy or a safety issue, correct?

6              MR. MINOR:  Object to the form.

7      A.   Again, I -- I wouldn't be able to make that

8   determination.

9      Q.   And if you tell Safeguard that it's a

10  bankruptcy, they'll do the no contact inspection and

11  charge the Hagers' file even though they weren't in

12  bankruptcy, correct?

13     A.   Again, I can't make that determination.

14     Q.   But it's Seterus' position that every

15  property inspection that was conducted on this loan

16  was necessary to ensure that the property was secure

17  and in good standing?

18     A.   That's correct.

19     Q.   That's the only reason they would do it?

20     A.   That's correct.

21     Q.   If you could turn to Exhibit 11.

22     A.   I have it.

23     Q.   And this is the NC Final that we talked

24  about earlier.

25     A.   Yes.

1          Q.    And do you see the date that says

2     October 17, 2012?

3          A.    I do.

4          Q.    And do you recall when the -- when Seterus

5     acquired the servicing rights to this loan?

6          A.    Yes.

7          Q.    When was it?

8          A.    October 1, 2012.

9          Q.    Okay.  So is it fair to say that an NC Final

10    form was sent 16 days after Seterus acquired the

11    loan?

12         A.    Yes.

13         Q.    Okay.  And -- and we talked earlier about

14    what would be the same and what would be different

15    depending on it being an acceleration notice; do you

16    recall?

17         A.    Yes.

18         Q.    Okay.  One thing that you said would be the

19    same, if you could look at the paragraph beginning

20    with "If full payment."

21         A.    Okay.

22         Q.    And it says:

23              "If full payment of the default amount is

24    not received by us in the form of a certified check,

25    cashier's check, or money order on or before the

173

```
1     expiration date, we will accelerate the maturity
2     date of your loan.  Upon such acceleration, the
3     entire indebtedness of the loan, including
4     principal, accrued interest and all other sums due
5     thereunder shall at once and without further notice
6     become immediately due and payable."
7              Did I read that correctly?
8        A.   You did.
9        Q.   Okay.  And so you would agree that that
10    clause in that document says that if payment -- does
11    not receive the amount due, Seterus will accelerate
12    the maturity amount of the loan?
13             MR. MINOR:  Object to the form.
14       A.   Yeah.
15       Q.   Okay.  And Seterus did not receive the
16    amount that they contend was due and owing before
17    December 6, 2012, correct?
18       A.   Seterus received a payment from the Hagers.
19       Q.   Okay.  Did it receive $3,204.72?
20       A.   It wasn't the full amount that was due.
21       Q.   Right.  And so what that paragraph that we
22    just read says:
23             "If full payment of the default amount is
24    not received, we will accelerate the maturity date
25    of the loan," correct?
```

174

```
 1        A.   That's what the statement says.

 2        Q.   Okay.  And that's what all the NC Finals

 3   say?

 4        A.   Again, that's what this statement says.

 5        Q.   Okay.  And the Hagers -- is it Seterus'

 6   position that the Hagers had ever paid the amount

 7   set forth in an NC Final letter to bring the account

 8   current?

 9        A.   The Hagers have made payments towards the

10   total amount that's been due.

11        Q.   Right.  They've been paying every month,

12   right, or close to it?

13        A.   Not every month.

14        Q.   Or close to it?  They've consistently been

15   making payments?

16        A.   They've been making payments.

17        Q.   Okay.  And this letter says:

18             "If full payment is not received, we will

19   accelerate the maturity date."

20             That's what that says, right?

21        A.   That's what this -- this sentence says,

22   correct.

23        Q.   And when it's referring to "full payment,"

24   it's referring to this amount due up -- up at the

25   top, and this example is $3,204.72?
```

175

```
 1                    MR. MINOR:  Object to the form.
 2         A.   The payment that is written in this letter
 3    is 3,204.72, correct.
 4         Q.   Okay.  And when it says "full payment of the
 5    default amount," that's the number that we're
 6    talking about, correct?
 7         A.   The total amount due.
 8         Q.   Okay.  And this was a letter that Seterus
 9    sent less than a month after they acquired the
10    servicing rights to the loan?
11         A.   Because the customers were greater than
12    45 days delinquent.
13         Q.   And so less than a month after they acquired
14    the servicing rights to this loan, Seterus sent a
15    letter to Cynthia Hager and Mike Hager, two separate
16    letters, correct?
17         A.   That's correct.
18         Q.   And both of those letters said if you don't
19    pay $3,204.72 before December 6, 2012, we will
20    accelerate the loan?
21         A.   That's what this letter says.
22         Q.   And like we talked about, once you
23    accelerate, you can't decelerate, that's it?
24         A.   Once this loan goes into the foreclosure
25    status, you have to reinstate the total amount due
```

1       or pay the loan off.

2           Q.   And -- and Seterus has never accelerated the

3       loan, correct?

4           A.   Because the customers made payments towards

5       what we identified was due.

6           Q.   But not the full payment as outlined in this

7       letter, correct?

8           A.   They made their full contractual monthly

9       payments.

10          Q.   But not the default amount as outlined in

11      this letter?

12          A.   They made a payment that changed this

13      letter.

14          Q.   Changed in what way?

15          A.   When you make a payment, you bring the loan

16      less than 45 days due.  So when you make a

17      contractual payment, you're due for the following --

18      depending on their loan history, depending on the

19      next month that's due.  So that voids out the North

20      Carolina Final Demand letter because as the Deed of

21      Trust and the Servicing Guide and the Note

22      identifies, Seterus is not going to foreclose on a

23      loan that is greater than 45 days past due and

24      identified by this letter.

25          Q.   Okay.  So Seterus -- if an NC Final goes

1    out --

2         A.   Can we take a break?

3         Q.   What's that?

4         A.   I'm sorry, can I get some more water?

5         Q.   Sure.

6         A.   Sorry.

7              MR. EDWARDS:  Off at 1:44.

8              (Recess taken from 1:44 to 1:45.)

9              MR. EDWARDS:  Back on at 1:45.

10   BY MR. MAGINNIS:

11        Q.   Okay.  Ms. Jacob, I promise we'll be done

12   soon.

13             My understanding of your testimony just now

14   is that if Seterus receives a payment in response to

15   an NC Final, then the debt is no longer 45 days due

16   and so that's sufficient to hold off the

17   acceleration process?

18        A.   That's correct.

19        Q.   Okay.  And is that -- is that Seterus'

20   policy just with regard to North Carolina?

21        A.   That's Seterus' policy for the loans where

22   we are accepting payments and we're able to apply

23   full contractual payment to the loan.

24        Q.   Okay.  So in response to a letter like

25   Exhibit 11, Seterus' policy, if they're accepting

178

1    payments, is if they receive an amount equal to a

2    normal monthly payment, they will not accelerate the

3    debt?

4        A.   As long as, right, it brings the loan less

5    than 45 days due.

6        Q.   Okay.  Where does it say that in this letter

7    that you will do that?

8        A.   It says in -- well, this is, as we know, is

9    a North Carolina demand letter because the loan is

10   greater than 45 days past due.  We know the customer

11   made a payment after this letter was sent out, which

12   in the transaction history showed that it brought

13   the account closer -- less than 45 days past due,

14   which voided this entire letter.

15       Q.   Right.  So -- and I believe the monthly

16   payment for the Hagers was -- at this time was

17   somewhere between 1,400 and $1,500; does that sound

18   right to you?

19       A.   Somewhere around there.

20       Q.   Okay.  So Seterus' policy is if they made a

21   payment of a normal monthly payment, somewhere

22   between 1,400 or 1,500, that would void this letter?

23       A.   Or a partial payment which was then pulled

24   from suspense and whatever was sitting in suspense

25   would be applied to it.

179

```
1          Q.   Okay.  So if they had a thousand bucks in
2     the suspense account and they paid $500, that would
3     void this letter as an example?
4          A.   That's correct.
5          Q.   Okay.  Where does it say that in this letter
6     that if you make one payment or enough such that one
7     payment is recorded, we won't do this, or does it
8     say that?
9          A.   Well, the expiration date provides really
10    the -- the timeline where the customer needs to make
11    some sort of payment so that the 45 days are not
12    past due.
13         Q.   Not some sort of payment, $3,204.72, that's
14    what it says, right?
15         A.   Yes.  And we're allowing the customer, we're
16    also -- yes.  We would like the $3,204.72.  But our
17    objective is not to foreclose on our customers.  Our
18    objective is to be able to take -- even if it's a
19    partial payment, if where -- if they're in the
20    bucket where a partial payment can be made, our
21    objective is to collect that payment to help them
22    stay in their house.  Because them making payments,
23    staying in their house helps us in our business as
24    well.  Foreclosing on them is really not, you know,
25    helpful to us nor to them.
```

180

1          Q.    Yeah.

2          A.    And so therefore, this letter is sent out

3    per the guidelines that are outlined and we allow

4    the customer -- we allow the customer to make that

5    partial payment.  And then when a full -- if a

6    partial payment does not equal the contractual

7    payment, then your -- then this letter still --

8    still stands.  But because a contractual payment is

9    able to be applied to the loan account, then we

10   don't have to continue with the -- this letter.

11         Q.    Seterus doesn't want to foreclose?

12         A.    That's correct.

13         Q.    It's expensive at a minimum, correct?

14         A.    Sure.

15         Q.    You don't want to kick people out of their

16   homes?

17         A.    We don't.

18         Q.    People don't want to be kicked out of their

19   homes?

20         A.    That's correct.

21         Q.    Why doesn't it say that in the letter?

22         A.    In my business -- I mean in my role, I'm

23   just here to testify on this letter and identify

24   that we do -- we were taking payments from the

25   Hagers when they made partial payments.  They never

181

```
1    stopped making a partial payment.  They never asked

2    for those partial payments to be taken -- you know,

3    given back.

4            They did not -- you're right, they did not

5    write a $3,204.72 check to us as we had asked --

6    requested to them by this letter.  They sent us a

7    partial payment.  And that partial payment was

8    applied to the suspense, which then the full

9    contractual payment would apply to the loan.

10   Q.   Does this say we hereby request that you

11   bring your loan current?  Is that what that says?

12            MR. MINOR:  Object to the form.

13   A.   The letter speaks for itself.

14   Q.   Okay.  And the letter speaks for itself.

15   You sitting here testifying as Seterus on -- as

16   to -- is there anything in this letter which states

17   if you make enough for a single partial payment, for

18   a single monthly payment, or if you make enough

19   combined with the suspense account to cover a single

20   partial payment, this notice will be voided?

21   A.   We identify that a customer is current when

22   they're in that 0 to 30-day delinquency -- in that

23   0 to 30-day bucket.  So by making a payment, the

24   customer is decreasing their delinquency status from

25   45 days to less than that.
```

182

```
 1            And when we're able to apply a contractual
 2     payment to the loan, it brings them -- it brings
 3     them closer to that.  So they are -- they are
 4     complying with what this letter is saying.
 5         Q.   But this letter doesn't say that, right?
 6         A.   This letter does say that.
 7         Q.   This letter says:
 8            "If full payment of the default amount" --
 9     meaning $3,204.72 -- "If full payment of the default
10     amount is not received by us in the form of a
11     certified check, cashier's check, or money order on
12     or before the expiration date, we will accelerate
13     the maturity date of your loan."
14            That's what that says, right?
15            MR. MINOR:  Object to the form.
16         A.   Again, the paragraph is written as it is
17     written.  We, as we've stated before, by the State
18     of North Carolina, the Note, the Deed of Trust, and
19     the servicing guidelines, when a customer is greater
20     than 45 days delinquent, we have to send this
21     letter.  And we have to let them know, that, yes, we
22     will accelerate.
23            If they don't do anything, if they don't
24     make a payment, that's -- a full contractual
25     payment, if they let this letter go until
```

1      December 6th, come December 6th, we would have

2      accelerated this loan if no payment was received.

3           Q.   And that's what you, testifying for Seterus,

4      thinks this letter and other NC Final letters say?

5                MR. MINOR:  Object to the form.

6           A.   I mean, again, like I said, the letter

7      speaks for itself.  This is how we identify this

8      letter.

9                MR. MAGINNIS:  Okay.  Why don't we take

10     a break.  I told you it would be quick.

11               MR. EDWARDS:  Off at 1:52.

12          (Recess taken from 1:52 to 2:00.)

13               MR. EDWARDS:  Back on at 2:00.

14     BY MR. MAGINNIS:

15          Q.   Ms. Jacob, just a couple more questions and

16     then we'll get you out of here.

17               There were a few references to some

18     departments where you may not have significant

19     personal knowledge such that you can answer specific

20     questions about it.  And so I wanted to know with

21     regard to some of these departments who we might

22     need to talk to so that we can get information about

23     these things.

24               The payment research team?

25               MR. MINOR:  What information did you

184

1    say she's not able to give?

2        Q.    Who might be -- who might we need to talk to

3    to get more information about the payment research

4    team; do you know?

5             MR. MINOR:  Can you say what

6    information that it was that you did not get that

7    you are requesting?

8             MR. MAGINNIS:  I mean I'm not going to

9    reread the whole transcript, but who might -- if I

10   wanted to talk to somebody about the payment

11   research team, who might I need talk to?

12            MR. MINOR:  Okay.  Well, I guess I'll

13   just object --

14            MR. EDWARDS:  Okay.

15            MR. MINOR:  -- to the form of the

16   question.

17       A.    I mean there's not anyone specific that I

18   can tell you.  I'm advising that we have various

19   different departments and different roles within

20   Seterus, and I'm identifying, to the best of my

21   knowledge, the testimony that I give today.

22       Q.    Does the payment research team have some

23   sort of team leader?

24       A.    I'm sure there are.

25       Q.    Okay.  But you don't know any of their

1     names?

2          A.   No.

3          Q.   Okay.  What about the quality control team?

4          A.   No.

5          Q.   Loss mitigation team?

6          A.   No.

7          Q.   Revenue, who might we need to talk to about

8     how Seterus makes money?

9          A.   Again, I think that's proprietary

10    information.  I wouldn't know where to tell you to

11    begin.

12         Q.   What about how much revenue they make, who

13    would we talk to about that?

14         A.   I mean you could make the request to counsel

15    and they can review it.

16         Q.   Okay.  So you can't think of anyone

17    specifically?  We would have to depose the

18    corporation to find out?

19         A.   I can't think of anyone specifically.

20         Q.   Okay.  The billing department?

21         A.   I don't know there is -- did I say there's a

22    billing department?

23         Q.   I don't know.  Did you not?  I think you --

24    is there -- is there a department that deals with

25    billing?

186

```
 1        A.   What do you mean by "billing"?  Can you
 2   define that?  What do you mean?
 3        Q.   Sending statements, receiving payments,
 4   credits, debits?
 5        A.   I mean when transactions are made or --
 6   they're applied to the account.  When a payment
 7   isn't received, is that what you're talking about?
 8        Q.   Is there -- is there a billing department or
 9   no?  Accounts receivable, not -- not associated with
10   vendors, but with customers.
11        A.   Not -- not really.
12        Q.   Okay.
13        A.   Yeah.  That I...
14        Q.   Okay.  Is there a property inspection
15   department?
16        A.   There is, yeah.
17        Q.   Okay.  And we would need to talk to somebody
18   at the property inspection department to understand
19   the agreement that Seterus has with Safeguard?
20        A.   I mean, I think I've relayed them today.
21        Q.   Okay.  Would -- are you aware at this time
22   of how charges differ for various tasks, Seterus and
23   Safeguard agreement?
24        A.   I believe --
25                  MR. MINOR:  Object to the form.
```

187

```
 1         A.   I believe the invoices speak for themselves.

 2         Q.   Okay.  But do you have any understanding

 3    sitting here today such that you can talk about that

 4    in detail?

 5              MR. MINOR:  Object to the form.

 6         A.   If you have a document that you'd like me to

 7    review, I can do it.

 8         Q.   Okay.  But there's a property inspection

 9    department that has some sort of team leader?

10         A.   We have a property inspection department.

11         Q.   Of which somebody is in charge?

12         A.   I mean I don't -- I couldn't tell you.  I

13    know that we have a property inspection team.

14              MR. MAGINNIS:  Okay.  Your counsel may

15    have some questions for you, but that is all the

16    questions that I have at this time.  Thank you so

17    much.

18              THE WITNESS:  You're welcome.

19              MR. MINOR:  No, actually, my questions

20    are to you.  You just made a line of questions to

21    the witness suggesting that you were not able to get

22    answers to certain questions, and you referenced

23    particular departments at Seterus that you believe

24    could provide you with answers.  And for the record,

25    I'd like you to identify the information that you
```

1    believe that you could get from the payment research

2    team that you were not given today.

3              MR. MAGINNIS:  I think what would

4    probably make sense to do is review the transcript

5    and it may well be that -- we -- we did hear a lot

6    of I don't knows and I -- and I don't have personal

7    knowledge about that; I can testify about this loan

8    file, et cetera.  And so what I think would make

9    sense to do is review the transcript, and if we find

10   that there are areas that we feel are deficient,

11   we'll send you correspondence to that effect and we

12   can deal with it off the record and hopefully

13   without any sort of court intervention.  Is that

14   fair?

15             MR. MINOR:  That is fair.  And I'm

16   going to just ask these only for purposes of the

17   record --

18             MR. MAGINNIS:  Of course.

19             MR. MINOR:  -- not to be argumentative.

20        As you sit here, can you tell me of any

21   questions in the area of quality control that you

22   sought answers to today that you did not receive?

23             MR. MAGINNIS:  I think that, just for

24   the record, we'll review the transcript.  We

25   identified the specific areas for which Ms. Jacob,

1    in my estimation, did not provide full and complete

2    answers consistent with the Notice, but we will

3    identify any specific questions, if we have any, in

4    communications with you all.

5                MR. MINOR:  Okay.  As you sit here

6    today and based on your recollection from the

7    testimony, can you tell me if you have any questions

8    in the area of loss mitigation that you do not

9    believe you got answers to from the witness?

10               MR. MAGINNIS:  With regard to payment

11   research, quality control, loss mitigation, Seterus'

12   revenue and how they make money, the existence, if

13   there is any, of a billing department or the

14   property inspection department and their dealings

15   with Safeguard, I will say that we've identified

16   that Ms. Jacob may not have full and complete

17   knowledge in response to the Notice, and we will

18   review the transcript accordingly.  And if we feel

19   like these responses are not full and complete and

20   consistent with the topics, we will send you

21   correspondence regarding all those topics that I

22   just identified with the hope that they can be

23   resolved amicably between the parties.

24               MR. MINOR:  Okay.  And just for the

25   record, I want to make it clear that before the

190

```
 1    conclusion of the deposition, I asked questions in

 2    an attempt to determine the specific areas relating

 3    to the groups that counsel just listed.  And

 4    although counsel has indicated that he may provide

 5    me with that information at some point later, I was

 6    not provided that information before the conclusion

 7    of the deposition.

 8                  MR. MAGINNIS:  Noted.

 9                  MR. MINOR:  I have no questions.

10                  MR. MAGINNIS:  Thank you so much.

11                  MR. EDWARDS:  Off the record at 2:07.

12             (The deposition concluded at 2:07.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    S I G N A T U R E

2

3          _____   I have read the foregoing pages which
     contain a true and accurate transcription of the
4    answers provided to the questions herein recorded
     and I do not desire to make any changes.

5
           _____   I have read the foregoing pages and wish
6    to incorporate the changes that are delineated on
     the errata sheet to my deposition.

7

8                          _____

9                                Achsah Jacob

10      I, _____, Notary Public for the

11   County of _____, State of

12   _____, do hereby certify that the

13   hereinabove named personally appeared before me this

14   the _____ day of _____, 2016, and that I

15   personally witnessed the execution of this document

16   for the intents and purposes hereinabove described.

17

18                         _____
                           NOTARY PUBLIC
19
                           STATE OF _____
20
                           MY COMMISSION EXPIRES:_____
21

22

23

24

25

192

1           T R A N S C I P T   C O R R E C T I O N S

2      CASE NAME: Michael A. Hager, et al. vs. Seterus,

3      Inc.

4      WITNESS NAME:  Seterus, Inc. --  By Achsah Jacob

5      FILE NUMBER:  1:15-cv-222

6      DATE:  7/19/16

7      PAGE   LINE  READS                    SHOULD READ

8      _____  _____ _____/_____

9      _____  _____ _____/_____

10     _____  _____ _____/_____

11     _____  _____ _____/_____

12     _____  _____ _____/_____

13     _____  _____ _____/_____

14     _____  _____ _____/_____

15     _____  _____ _____/_____

16     _____  _____ _____/_____

17     _____  _____ _____/_____

18     _____  _____ _____/_____

19     _____  _____ _____/_____

20     _____  _____ _____/_____

21     _____  _____ _____/_____

22     _____  _____ _____/_____

23     _____  _____ _____/_____

24     _____  _____ _____/_____

25     _____  _____ _____/_____

193

```
 1                    CERTIFICATE OF REPORTER

 2      STATE OF NORTH CAROLINA )

 3      COUNTY OF JOHNSTON      )

 4

 5          I, DONNA ROWE, Notary Public in and for the

 6      County of Johnston, State of North Carolina at

 7      large, do hereby certify:

 8          There appeared before me Achsah Jacob at the time

 9      and place herein aforementioned;

10          The said witness was sworn by me to state the

11      truth, the whole truth, and nothing but the truth,

12      in said cause;

13          The testimony was taken down before me

14      stenographically and the foregoing 193 consecutively

15      numbered pages are a complete and accurate record of

16      the testimony given by said witness;

17          I certify that I am not counsel for nor in the

18      employment of either of the parties of this action,

19      nor am I interested in the results of this action.

20          IN WITNESS THEREOF, this 25 th day of July, 2016.

21                              _____

22                              DONNA ROWE
                                COURT REPORTER
23                              NOTARY PUBLIC
                                20012880153
24

25
```